WEST TEXAS BANK & TRUST CO. v.
MATLOCK et al. (No. 5365.) †

(Court of Civil Appeals of Texas. San Antonio.
Dec. 5, 1914. Rehearing Denied
Jan. 6, 1915.)

1. TRUSTS (§ 153*)—DURATION—INTEREST OF DONOR.

S., in making sales of land, issued a pamphlet in which it was stated that he had agreed to pay $50,000 bonus for the first railroad through the land, and that he thereby contracted to pay this bonus when a road was located, or, if no railroad was running trains before the farm and lot distribution, that he would turn over such sum to trustees to be chosen by the purchasers, to be by them given as a bonus to the first railroad running trains through the land. These terms were made the basis of every contract of sale. S. delivered the fund to trustees under an agreement by which it was to revert to him unless a railroad was built within a specified time, and they refused to deliver the fund to trustees chosen by the purchasers until a bond was given to comply with this agreement. Held that, by the contract between S. and the purchasers, the donation was absolute and without time limit, and the trustees could not alter that contract nor ingraft conditions as to time thereon, and hence S.'s executor had no claim to the fund, even though no railroad was built within a reasonable time.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 198; Dec. Dig. § 153.*]

2. TRUSTS (§ 61*)—DURATION — REASONABLE TIME.

A jury finding that a reasonable time for the building of a railroad had not expired, if material, was supported by the evidence, where it appeared that after the distribution of the land S. was engaged in promoting the building of a railroad, and caused all effort to obtain any one else to build a road to cease, and was still so engaged when he died leaving a line of railway 43 miles in length running towards the land; that the suit was filed about 14 months after his death; and that the period had been one of depression when money was not easily obtained for railroad building.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 83–87; Dec. Dig. § 61.*]

3. TRUSTS (§ 61*)—ACTIONS INVOLVING TRUST FUND—PARTIES.

In a suit by the executor of S. to recover the bonus on the ground that a railroad had not been built within a reasonable time, purchasers of land in reliance on the offer of the bonus were proper parties to the suit, as they were the beneficiaries of the trust.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 83–87; Dec. Dig. § 61.*]

4. TRUSTS (§ 227*) — ACTIONS INVOLVING TRUST FUND—COSTS AND FEES.

Where a trust fund is involved in litigation, a trustee is allowed out of the fund reasonable attorney's fees for prosecuting or defending the suit, and, while it is the rule that a trustee who is an attorney and prosecutes or defends a suit connected with the trust fund cannot charge for his professional services, where there is more than one trustee, they may employ one of their number and pay him for his services out of the fund.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 324; Dec. Dig. § 227.*]

5. APPEAL AND ERROR (§ 877*)—REVIEW—PARTIES ENTITLED TO ALLEGE ERROR.

In a suit involving a trust fund, parties who were adjudged to have no right, title, or interest in the fund could not complain of the allowance of attorney's fees from the fund to the attorney for the trustees and the attorney for the beneficiaries.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3560–3572; Dec. Dig. § 877.*]

6. TRUSTS (§ 153*)—INTEREST ON TRUST FUND—PERSONS ENTITLED TO INTEREST.

Where an owner of land, in advertising it for sale, issued a pamphlet stating that a specified bonus would be given for the first railroad through the land, and that, if no railroad was running before the farm and lot distribution, the bonus would be turned over to trustees selected by the purchasers, to be by them given as a bonus to the first railroad, it was the trustees' duty to place the bonus on interest, and the interest became a part thereof, and the donor had no right thereto.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 198; Dec. Dig. § 153.*]

Appeal from District Court, Bexar County; S. G. Tayloe, Judge.

Action by the West Texas Bank & Trust Company, executor, against A. L. Matlock and others, trustees. From a judgment for defendants, plaintiff appeals. Affirmed.

McFarland & Lewright, of San Antonio, for appellant. A. L. Matlock and Butler L. Knight, both of San Antonio, for appellees.

FLY, C. J. Appellant, as the executor of the last will and testament of Dr. C. F. Simmons, deceased, instituted this suit to recover from A. L. Matlock and A. M. Avant, as trustees, a trust fund of $50,000, received by them on or about December 28, 1908, from R. L. Ball, J. P. Barclay, and E. P. Simmons, trustees.

It was alleged in the petition that Dr. Simmons died on November 4, 1910, and that appellant was duly appointed the executor of his last will and testament; that on or about December 28, 1908, there was a deposit in the National Bank of Commerce of $50,000 in the names of R. L. Ball, J. P. Barclay, and E. P. Simmons, trustees, which was deposited by C. F. Simmons as a trust fund to be paid to any railroad company that might build and operate a line of railway through certain lands in Live Oak county and through Simmons City on said land, in accordance with the terms and conditions laid down in a certain booklet circulated by said Simmons, entitled "Home, Sweet Home," and especially rules 9 and 22 in said booklet, said bonus to be paid to the first railroad company with Eastern or Northern connections which might build its line through said land and town; that if no such railroad was built within a reasonable time, the money was to be returned to C. F. Simmons, his heirs or assigns. It was further alleged that, in pursuance of rule 9 of the booklet, Matlock, Avant, and Eastman, trustees, were elected by the purchasers of the land to receive and hold the $50,000 bonus, and it was placed in their hands to be held by them as it was by the first set

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes
† Writ of error pending in Supreme Court.

of trustees, the interest on the money to be paid to C. F. Simmons, and, if no railroad was built within a reasonable time, the money was to be returned to C. F. Simmons; his heirs or assigns; that more than a reasonable time had elapsed and no railroad had been built, and appellant was entitled to have the money for the estate of C. F. Simmons, deceased.

Walter Brown and others who purchased lands from Dr. Simmons, under the terms set out in the booklet, asked to intervene, in order to protect their interest in the $50,000, which was a part of the inducements held out to them to buy the lands; that the trustees had been elected by them and authorized to receive the money and hold the same in trust for the first railroad that built through the land, said money to be held by them under the provisions of rule 22 in said booklet, without any limitation as to time; that without their knowledge or consent the trustees had agreed that said money should be held for a reasonable time and then paid back to Simmons, and such stipulations were secretly made and were a fraud upon the rights of interveners; that said $50,000 was taken out of money paid on the land by interveners. It was further alleged that the contract made with their trustees and Simmons was made without their knowledge or consent, and was in fraud of their rights, and interveners are not bound by the acts of the trustees in accepting the $50,000 upon the secret conditions imposed upon them.

The trustees answered that Simmons had represented to them that he intended to build the railroad and get the bonus; that the money should not be taken by them, but be left in the National Bank of Commerce of San Antonio; that they afterwards learned that Simmons did not intend to complete the road, but was claiming that in 2 years the money would revert to him; that they then demanded the money from Simmons, and were informed by him that the money was in the hands of trustees appointed by him, and they would be compelled to give a bond in accordance with the terms of a private trust agreement between him and his trustees; that in that agreement different stipulations and conditions were attached to the bonus from those made with the purchasers of the land which were contained in rule 22 of the booklet of "Home, Sweet Home"; that in the private agreement made by Simmons with his trustees it was stipulated, if a bond was not made in 12 months from the date of the distribution of the lands to the purchasers thereof, the bonus was to revert to Simmons, and 11 months of the time had expired when appellee trustees discovered that fact, and they immediately demanded the money from Simmons' trustees and offered to give the bond. It was further alleged that Simmons' trustees refused to accept the bond, unless it was conditioned in accord with the conditions of their private agreement with Simmons, and they were compelled to so execute the bond in order to obtain the money; that Simmons built a railroad from Macdona, a station on the International & Great Northern Railroad, to Christine, in Atascosa county, a distance of 43 miles, towards the land in Live Oak county, and thus prevented other railroad builders from building a road to said land; and that a reasonable time had not elapsed for the building of said road.

Only one issue was presented to the jury, as follows:

"Under all the facts and circumstances shown by the evidence in this case, has a reasonable length of time transpired since September 8, 1908, for the construction of a railroad of the character as described in the bonus proposition made by the said Dr. Simmons?"

The question was answered in the negative, and a judgment for appellees was rendered.

The contracts of sale made by C. F. Simmons and the purchasers were based upon a rose-colored pamphlet or booklet issued by Dr. Simmons under the alluring title of "Home, Sweet Home, A Home in the Sunny South for a Song," which not only appealed to the populace by beautiful descriptions of the land and accounts of its wonderful fertility and productivity, but sought to arouse the sentiments of the lovers of home by copying such songs as "My Old Kentucky Home" and "Home, Sweet Home," and touched their religious feelings by copying hymns referring to homes across the river such as "Home of the Soul" and "Nearer My Home." There was contained in the booklet a comparison between the producing capacity of lands in Texas and other states, greatly to the advantage of Texas, and it was declared that Ex-President Roosevelt had said, "Texas is the garden spot of the Lord," and that "investigation will show that the famous Nueces River Valley, from 80 miles south of San Antonio [the largest city in the state] southward for 40 miles, is the very cream of the 'center of the garden.'" A veritable Utopia was painted in word pictures that undoubtedly made a strong appeal to the hearts of men, but none of the representations struck with more force than the munificent offer of a bonus of $50,000 to insure the building of a railroad along the valley of the Nueces river until the "center of the garden" was reached in Live Oak county. This was expressed through what is denominated in the booklet "Rule 22," and is as follows:

"One of the proposed railroads through this property already has ten miles graded, and owner has agreed to pay $50,000 bonus for the first railroad to come through this land down the river on the side of the new town and through it. This bonus owner hereby contracts to pay when road located as above shown is running trains, provided the road is running passenger trains before the day of farm and

lot distribution; but, if no railroad located as above indicated is running trains on the day of distribution, then owner hereby guarantees that he will on that day turn over to the three trustees, in trust, fifty thousand dollars in gold, to be by said trustees given as a bonus to the first railroad having an Eastern or Northern railroad connection, which runs passenger trains through this property on line above indicated. This bonus guarantees to each purchaser, free of cost, the first railroad just where it should be, and it will doubtless make a race between the railroads to get there first."

Around that rule the whole of the land transactions seemed to revolve, and its terms were made the basis of every contract.

[1] According to the terms of that part of the booklet, Simmons bound himself to turn over to the trustees, the election of whom by the purchasers was provided for in rule 9 of the booklet, the sum of $50,000, to be used as a bonus to secure the building of a railroad to the land sold by Simmons. There was no time limit to the donation, but it was absolute, and was one of the inducements to the purchase of the land by interveners. The bonus was not conditioned on the building of a road in a "reasonable time," but it was absolute and unconditional, guaranteeing, in the language of the rule, "to each purchaser, free of cost, the first railroad just where it should be." That contract was between Simmons and the purchasers of the land, and the trustees were given no authority to alter that contract or to ingraft conditions as to time thereon. They were trustees merely to receive and safely keep the bonus until the road should be built.

C. F. Simmons by his contract lost all control over and interest in the bonus, which was given to interveners to be used for a specified purpose. They, of course, could not divert it from the purpose to which it was dedicated, and neither could Simmons or the trustees. The contract made by the trustees was made without the knowledge or consent of the purchasers to whom the bonus had been given, and made under stress of circumstances, without authority and without consideration. The secret agreement made by Simmons with his trustees, and the agreement made by the latter with the trustees of the purchasers, cannot destroy the contract made between Simmons and the purchasers of the land. The men who bought the land were not purchasers of only sunshine and soil and cactus and chaparral many miles from railroad facilities, but they bought the means of inducing the building of a railroad to their land, and cannot be deprived of it without their knowledge and consent. The documentary evidence was such that a verdict should have been instructed for appellees, on the ground that the bonus was an absolute donation to the purchasers of the land, to be used for certain purposes.

[2] If the issue of reasonable time in which to build the railroad was raised by the evidence, there was abundant testimony to sustain the finding of the jury. For several years after the final distribution of the land took place Dr. Simmons was engaged in promoting the building of the road, and, while so engaged, he died, in 1910, leaving a line of railway 43 miles in length running in the direction of the land. He caused all effort to obtain any one else to build a road to cease during his life, and this suit was filed in about 14 months after his death. The financial condition of the country was one of depression during much of the time, and money not easily obtained for railroad building. If there was delay in building the road, it lay at the door of Dr. Simmons during his life and to his representatives after his death. The purchasers were not guilty of laches in connection with the bonus, but naturally were anxious to obtain the railroad and realize something on their investment in the central garden of Texas. Without the railroad the garden was a vision and of "such stuff as dreams are made of."

[3] Of all men, none had such vital interest in this suit as the purchasers of the land; for upon the bonus depends the protection of the values of their land and prevent them from remaining those of mere pasture lands distant from a market. They had the right to intervene to protect the money they had purchased with their lands. They did not seek to divert the fund from the purpose to which it was dedicated, but intervened to prevent its appropriation by the executor of the estate of C. F. Simmons. They were the beneficiaries in the trust fund, and were proper parties to the suit. Ebell v. Bursinger, 70 Tex. 120, 8 S. W. 77. The interveners asked for nothing except enforcement of the terms of the trust as set out in their contracts with C. F. Simmons. If it "was utterly immaterial where said $50,000 originally came from," then the allegation that it came out of money paid by the purchasers of the land could not have injured any one.

The answer of the trustees and the plea in intervention of the purchasers were not subject to attack by the general demurrer and the special exceptions of appellant, and the assignments of error from the first to the twenty-fourth, inclusive, which claim error in the overruling of the exceptions, are not sustained.

We construe the contract between Simmons and the purchasers of his lands as giving them a vested interest in the $50,000, as hereinbefore set out, and the money should be held in trust by the trustees for the uses to which it was set apart. Neither the agreement made by Simmons with his trustees nor the agreement signed by the purchasers' trustees should be consulted in determining the terms of the trust. The assignments of error from the twenty-fifth to the thirty-eighth, inclusive, are overruled. The thirty-ninth assignment of error is too general and indefinite to be considered.

[4] There are few cases in which attorney's fees are allowed either party for the prosecution or defense of the suit. The general rule is that every litigant must pay his attorney, but in cases where a trust fund has become involved in litigation a trustee is allowed, out of the fund, reasonable attorney's fees for prosecuting or defending the suit. It is the rule, however, that a trustee who is an attorney and who prosecutes or defends a suit connected with the trust fund cannot charge for his professional services. There are exceptions to this rule, however; one being where there is more than one trustee, in which case they may employ one of their number and pay him out of the trust fund for his professional services. Perry on Trusts, § 432. The rule as to not allowing an attorney's fee to a trustee for his services is not favored in Massachusetts. Turnbull v. Pomeroy, 140 Mass. 117, 3 N. E. 15. We do not feel disposed to hold that two of three trustees could not employ the third to prosecute or defend a suit about the trust fund and pay him out of that fund. It may be, where there is only one trustee, that he cannot contract with himself for professional services, but this does not appeal with force to this court, as the trust fund would be protected by an order of the trial court fixing the fee.

[5, 6] If the fees should not have been allowed for the attorney of the trustees, who is a trustee, and for the attorney of the interveners, we fail to understand what right appellant has to complain about it. It was adjudged that it had no right, title, or interest in the fund, and it cannot be heard to complain about the matter. The trust in this case is for the benefit of the purchasers of the Simmons lands, and they alone can complain of the disposition of it. And in this connection it may be said that the appellant has no right to the interest accruing from the trust fund, which must follow the corpus of the fund. Upon what hypothesis the interest is claimed does not appear. It was the duty of the trustees to place the bonus so that it would bear interest, and, under the terms of their appointment, the interest became a part of the bonus, no matter what contracts the trustees may have entered into with Simmons, who parted title with the bonus and had no authority over it.

Simmons, it seems, made a genuine effort to build the road to Simmons City, but had not accomplished that end when he died, and now that the building of the road was not accomplished by him his executor seeks to recover the money given by him to the purchasers of the land, and thereby prevent them from having that sum to encourage others in building the road. The estate has no ownership in the bonus.

We adopt the conclusions of fact set out in the judgment.

The judgment is affirmed.