SANTA ROSA, INFIRMARY et al. v. CITY OF SAN ANTONIO. (No. 518–3971.)*

(Commission of Appeals of Texas, Section A. March 12, 1924.)

**1. Appeal and error ⟐1083(6)—Supreme Court not bound by Court of Appeals' view of facts, where evidence is wholly uncontradicted.**

When the evidence is wholly uncontradicted, differences of opinion between the trial court and Court of Appeals are wholly on questions of law, and the Supreme Court, on writ of error, may decide all issues presented without reference to the Court of Appeals' view of the facts.

**2. Appeal and error ⟐719(1)—Issue on which evidence is unconflicting properly presented by parties' agreement without assignments of error.**

Where the parties agree as to what is the sole issue on appeal, and the testimony is shown by a statement of facts in the record to be unconflicting, the question is properly before the Court of Appeals without assignments of error.

**3. Taxation ⟐204(2)—Exemption statutes construed strictly against exemption.**

Exemptions from taxation are never favored, and, in construing laws exempting any citizen or class of property, all doubts are resolved against the exemption.

**4. Constitutional law ⟐33—Taxation ⟐241 (1)—To be exempt property must be within exemption statute as well as Constitution, which is not self-executing.**

For property to be exempt from taxation as used exclusively and owned by institutions of purely public charity, it must come within Rev. St. art. 7507, subd. 6, as well as Const. art. 8, § 2, as amended in 1906, which is not self-enacting, but merely authorizes legislative provision for exemption of certain property.

**5. Taxation ⟐241(1)—Property must be exclusively used by charitable organization to be exempt.**

To be exempt from taxation, under Const. art. 8, § 2, as amended in 1906, authorizing the Legislature to exempt buildings used exclusively and owned by institutions of purely public charity, property must be exclusively used by such an organization and not partially used by others, whether they pay rent or not.

**6. Taxation ⟐241(2)—Hospital held "exclusively used by purely charitable institution" within constitutional authorization of exemption.**

A hospital maintained by a corporation merely subsidiary to and controlled by an organization of Roman Catholic Sisters, from whom its members were chosen, *held* exclusively used by an institution of purely public charity within Const. art. 8, § 2, authorizing exemption of the property of such institutions from taxation, though most of the rooms were used for the care of pay patients, surgeons not wholly engaged in charitable work were permitted to use the operating rooms for certain fixed charges imposed on their patrons able to pay, a certain ward was devoted to charitable work by a clinic conducted by the same Sisters, and a drug store in the building sold drugs to pay patients for a profit.

**7. Taxation ⟐191—Accumulation of large estates by charitable corporations and unfairness of exemption to competitive enterprises does not affect legality.**

That exemption of charitable corporations from taxation will result in their accumulation of large estates, and be unfair to competitive business enterprises, does not affect the Legislature's power to exempt them, as the field of charity is broad, and the Legislature may curtail or wholly withdraw the exemption at its pleasure.

---

⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing denied April 23, 1924.

**8. Taxation ⬤⇒241(2)—Infirmary held purely public charity within exemption statute.**

The Santa Rosa Infirmary, incorporated without capital stock for purely charitable and benevolent purposes, which must be continued by any renewal of its charter (Rev. St. art. 1136), *held* a purely public charity, exempt from taxation, within Rev. St. art. 7507, subd. 6, defining such an institution as one which dispenses its charities both to its members and others in sickness, distress, and death, without regard to the recipients' poverty or riches, and binds its funds, property, and assets to relieve its members in want, sickness, and distress, provides homes for helpless and dependent members, etc.; those in charge being trustees of an express trust, any beneficiary of which, as well as representatives of the state government, could enjoin a use or appropriation of the trust estates for private gain or other purposes inconsistent with such purposes.

**9. Taxation ⬤⇒241(2)—Payment for hospital plant and expenditures for training nurses from incidental earnings of charitable institution do not deprive it of exempt status.**

An infirmary conducted for charitable purposes need not be supported exclusively by gratuities or donations to be exempt from taxation, and does not lose its exempt status under Rev. St. art. 7507, subd. 6, by paying for its plant from incidental earnings, or expending funds realized therefrom for training nurses, which is within the proper upkeep and maintenance requirements, for which profits may be appropriated.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by the City of San Antonio and another against the Santa Rosa Infirmary and another. Judgment for defendants reversed, and judgment rendered for plaintiffs by the Court of Appeals (249 S. W. 498), and defendants bring error. Reversed, and judgment of district court affirmed.

J. C. Sullivan and Don A. Bliss, both of San Antonio, for plaintiffs in error.

Etheridge, McCormick & Bromberg, of Dallas, as amici curiæ.

T. H. Ridgeway, Wm. J. Park, R. L. Marshall, Herbert Oliver, W. C. Douglas, and Jos. Ryan, City Atty., all of San Antonio, for defendants in error.

BLANKS, J.   The city of San Antonio and the San Antonio independent school district instituted this suit in one of the district courts of Bexar county against the Congregation of the Sisters of Charity of the Incarnate Word and the Santa Rosa Infirmary, both incorporated under the laws of Texas, to recover certain taxes assessed by the city and school district for the fiscal year beginning June 1, 1918, and terminating May 31, 1919, against certain real estate and improvements thereon situate known as the Santa Rosa Infirmary, a general hospital, in the city of San Antonio, for the treatment of surgical and medical cases. Liability was denied upon the sole ground that the property was exempt from taxation under the provisions of section 2, article 8, of the state Constitution, and subdivision 6 of article 7507 of the Revised Statutes, relating to the exemption from the taxation of public charities.

No jury was had in the trial court, and the case was submitted upon an agreement between the parties litigant as follows:

"It is agreed by all parties in this cause that no question is made by the defendants as to the regularity of the proceedings of the assessment of the property, and of the approval of the tax rolls, and the placing of the same in the hands of the city tax collector for collection of the taxes; and it is agreed that this has all been regularly done, and that those taxes have not been paid by either of the defendants for the fiscal year 1918.

"It is also agreed that the sole question for determination in this cause is whether or not the institution owned by the defendants is exempt from taxation by reason of the Constitution and laws of the state of Texas; and, further, that the property in question has never been exempted by the governing body of the city of San Antonio from taxation.

"It is also agreed that the city has not assessed any taxes on that part of the building used exclusively for religious worship."

The only evidence in support of the claim for exemption consisted of a deed, a vendor's lien note, and corporate charters, about which there was no controversy, and the uncontradicted testimony of three of the sisters in general charge of the hospital or its related activities, and no controverting proof was offered by the city and school district.

As thus presented upon wholly unconflicting testimony, the trial court rendered judgment denying the claim for taxes, and filed its conclusions of fact and law. Assignments of error separately setting out the material findings of the trial court, and challenging them upon the ground that "there was no evidence" to sustain them were appropriately filed, and, upon the appeal of the case by the city and school district to the Court of Civil Appeals of the Fourth District, at San Antonio, the judgment of the trial court was reversed and rendered for the plaintiffs below (249 S. W. 498), and writ of error has been granted by the Supreme Court because of the importance of the question involved.

[1] Much of the brief and argument in support of the application for the writ is devoted to a criticism of the Court of Civil Appeals because of its findings of fact claimed to be either wholly contrary to those of the trial court, or upon what is claimed to be new or supplemental issues not touched upon by the trial court, and in the brief of defendant in error it is with equal insistence argued that the Supreme Court is bound by

the conclusions of the Court of Civil Appeals on the facts.

But neither of the positions are well taken in a case such as this where the evidence is wholly unconflicting and presents a state of wholly undisputed facts. The controversy here is not what are the facts, but what are the material and controlling facts, and what is the legal effect of them as determinative of the sole issue of the exemption, or not, from liability for taxes of the hospital property under consideration. The differences of opinion between the trial court and appellate court were wholly and necessarily upon questions of law, and a question of law, and nothing more, is presented here. As clearly pointed out by Justice Gaines in Land Co. v. McClelland, 86 Tex. 179, 23 S. W. 576, 1100, 22 L. R. A. 105, the judgment of the Court of Civil Appeals upon the facts is conclusive upon the Supreme Court only where the evidence is conflicting. When the evidence is wholly without contradictions, it is undoubtedly within the province and jurisdiction of the Supreme Court to decide all issues presented for determination upon the undisputed evidence without reference to the appellate court's view of the facts, and for the same reason the appellate court was in no sense bound by the conclusions of fact of the trial court.

[2] In view of the agreement between the parties litigant that the sole issue for determination here is whether or not, under the Constitution and laws, the property in question is exempt from taxation and the unconflicting state of the testimony shown by a statement of facts in the record, the question was properly before the Court of Civil Appeals without any assignments of error at all. It is a situation identical in effect to an agreed statement of facts presenting for adjudication an agreed issue of law, and, as stated by Chief Justice Gaines, in Wilson v. Johnson et al., 94 Tex. 272, 60 S. W. 242:

"The purpose of assignments of error is to point out the errors complained of, and not to leave the appellate court to grope through the record to ascertain whether error has been committed or not. Where the question is agreed upon, we do not see how the point could be called more directly to the attention of the court. Besides, both under the statute and under the rules, the court may consider errors 'apparent upon the face of the record.' Since every error must, in one sense, appear upon the face of the transcript, it is difficult to tell what is meant by this language; but we incline to think it intended to signify a prominent error, either fundamental in character or one determining a question upon which the very right of the case depends. Harris v. Petty, 66 Texas, 514."

The Sisters of Charity of the Incarnate Word, without capital stock, was incorporated under the laws of Texas in 1881 for the purely charitable purpose of the "adoption of orphans and other children and the caring for and nursing wounded, sick and afflicted persons," and prior to March 1, 1919, in addition to conducting the hospital here under consideration, operated orphanages, a home for the aged, and several educational institutions at different locations in San Antonio, wholly distinct and segregated from the land upon which was located the hospital. Other than in the conduct of the hospital the activities of this corporation appear to have been of a purely charitable or educational character.

On March 1, 1919, the foregoing corporation conveyed the hospital property to the Santa Rosa Infirmary Corporation in consideration of its promissory note in the sum of $125,000 payable in 20 years, with interest at 6 per cent. per annum, and to secure the payment thereof a vendor's lien was reserved in the deed against the property conveyed. At the time of the trial of this case in the lower court $37,000 had been paid on this note out of the accumulated earnings of the hospital property.

The Santa Rosa Infirmary, incorporated in 1918, was chartered for the following purpose:

"The purposes of this corporation shall be both benevolent and charitable, and especially for the acquisition of, or the erection of and the maintenance of a hospital in the city of San Antonio, Bexar county, Tex., at which the members of this corporation will administer to the sick, the infirm, the helpless, the maimed, and the afflicted of all creeds, colors, and nationalities, to enable its members to receive and properly to care for all such as may be brought to, or present themselves at, the infirmary of this corporation, for such treatment, nursing and care—especially excluding and excepting, however, such person or persons as may be suffering from any mental or contagious disease—and to alleviate the ills, sufferings, pains, and afflictions of all such as are included, as before mentioned, and to restore them, as far as possible, to the best condition of health."

It has, by express charter provision, the usual right to acquire and hold property of any kind which in the judgment of its directors may seem necessary, requisite, or appropriate for carrying out the objects and purposes of the corporation, and has the related authority to sell and dispose of its property when in the judgment of its directors it may seem advisable, expedient, or proper to do so.

It had no capital stock, and, as provided by the charter itself, the members of the corporation were chosen from the membership of the Sisters of Charity of the Incarnate Word of San Antonio. These members were selected by the Superioress General of the latter organization, and it is quite apparent that to all intents and purposes the Santa Rosa Infirmary Corporation, as such, is merely subsidiary to the parent organization, and is controlled by it in the management and operation of the hospital property.

As indicating the exact nature of the hos-

pital enterprise there is here quoted the testimony of Mother Robert, Superioress of the Santa Rosa Infirmary, and president of the corporation of that name:

"A Sister of Charity of the Incarnate Word becomes a member of the Santa Rosa Infirmary Corporation when she is assigned to duty at the Santa Rosa Infirmary by the Congregation of Sisters of Charity of the Incarnate Word. The Sisters of Charity of the Incarnate Word only are eligible to such membership. The Sister ceases to be a member of the infirmary corporation when she is transferred to another institution or congregation, or removed by death. A Sister has no other interest in the corporation than that of membership. A Sister receives no compensation in the corporation; but rooms are reserved at the infirmary for the use of the Sisters of the corporation when they are sick, or disabled, or incapacitated for work. Yes, the members of the infirmary corporation are also entitled to room, board, clothing, and burial, at the corporation's expense.

"The value of the property of the Santa Rosa Infirmary, when conveyed to the Santa Rosa Infirmary Corporation (March, 1919) was $125,-000. The present value (May, 1922) of the property is about $200,000, more or less. The present property consists of a large building and the grounds on which it is located, at West Houston street, San Antonio, Tex., together with the necessary furniture, appliances, operating rooms, and drugs, medicines, and all such things as are adapted to the proper conduct of a hospital. Yes, patients are received in the said hospital; all patients who apply or all who are brought to the infirmary are received without regard to creed, without regard to nationality, without regard to race or color, without regard to financial condition, without regard to the disease, excepting those suffering from mental or contagious diseases. No, no one is refused admittance to the hospital as a patient, except those suffering from contagious and mental diseases. Yes, a charge is made; such charge is made to all patients whose financial condition permits them to pay for the service; the money so received is used for the maintenance, upkeep and improvement of the hospital facilities, for the liquidation of the debts, including the vendor's lien note and interest thereon; also an assessment is paid to the Mother House to maintain and educate the young Sisters, future members of the Santa Rosa Infirmary Corporation, and for the support of the sick and disabled members of the corporation. The infirmary has no other source of revenue than that derived from pay patients. The rate of charges for pay patients varies from $12 to $45 per week, according to the accommodations required by the patient. No charge is made for a special room, except as specified, but a special charge is made for special nurses; the charge per week for a special nurse is $21. Yes, a special charge is made for operations, laboratory facilities, medicines, medical supplies, and surgical dressings. The funds required for the maintenance, upkeep, and improvement of the hospital facilities are derived solely from receipts from pay patients. In 1918 the receipts were $117,767.75; in 1919, $169,175.99; and in 1920, $204,296.50. The disbursements for 1918 were $94,305.57; for 1919, $148,228.80; for 1920, $171,465.33.

259 S.W.—59

The funds so earned during those three years were paid out, first, for the maintenance of the infirmary, upkeep, and improved facilities, debt and interest, training of future members of the corporation, for the support of the aged and disabled members, and the balance to a building fund."

She testified further:

"Yes, the Sisters of Santa Rosa Infirmary engage in other charities and charitable works. They conduct St. Luke's Free Clinic, feed and clothe the needy and hungry who present themselves, without charging therefor, receive unfortunate girls and find homes for their offspring, and then procure suitable employment for the mother when the condition of her health permits. Yes, they feed and clothe the hungry and needy, and no charge is made therefor. They receive unfortunate girls, but they do not seek them out; they care for them and find homes for their offspring, and suitable employment for themselves. The Santa Rosa Infirmary secures the means to perform these added charities from the general funds of the Santa Rosa Infirmary; and the approximate aggregate of the total of these charities is between $12,000 and $15,000 a year."

Referring to the exact nature of St. Luke's Clinic, Sister Wendelinus, treasurer of the parent corporation, the Sisters of Charity of the Incarnate Word, testified:

"The Santa Rosa Infirmary is the home of the St. Luke's Clinic. The Santa Rosa Clinic was established in 1914 by Bishop Shaw, Dr. Burris, and the late Dr. Jackson, to give poor eye, ear, nose, and throat patients treatment; it was a source of expense to Santa Rosa Infirmary, and considered an added charity. All patients are received free of charge in that clinic, and are operated on free. The Santa Rosa Infirmary furnishes to the clinic office quarters and a waiting room, and it gives six beds to the exclusive use of St. Luke's Clinic; it furnishes service of nurses daily, and twice a week the use of the operating room with its full staff. St. Luke's Clinic gives a little offering of $500 a year, which would not even cover the rental for one month, if we should put pay patients in. The clinic contributes that much a year—from the clinic fund the gift is made."

And, referring to a drug store kept in the hospital building, said:

"There is a drug store connected with the hospital. The drug store fills prescriptions for the accommodation of the patients and the doctors, at a small profit. We don't sell to outsiders; the drug store is kept for the filling of prescriptions of the patients in the hospital. * * * With reference to the drug store, we paid out more for drugs than we got back from patients, because the charity patients were supplied, and the expenses were there, but no income for it. I would have to refer to the book to see what amount that was; it was considerable."

Speaking of the general financial situation surrounding the operation of the hospital and its charitable dispensations, Sister Al-

cantra, secretary and treasurer of the Santa Rosa Infirmary Corporation, testified:

"With reference to what I consider charitable purposes, in my statement that the institution is used solely for benevolent and charitable purposes—any patient who presents himself, or is brought to the infirmary, is received, without regard to creed, color, or financial condition, and without regard to the disease, except only those suffering for mental or contagious diseases. Any person seeking charity at the hands of the institution is given such treatment, but in the conduct of the institution a large majority of the patients are those who seek the services of the institution for pay, and the applicants for charity are comparatively small in number, and the institution is entirely self-sustaining; and it is not in any way dependent on outside charity or solicitation from other organizations connected with the church; it is derived solely from pay patients, and in its upkeep is included the upkeep or support of the corporation and the training of new members to take the place of those now there. "With reference to the pay of physicians and surgeons who attend the patients at the hospital—the pay patients pay their own doctors separately, and they have physicians of their own selection. We have a staff of doctors there, but they are not employed by the hospital. We have a pathologist we pay, and a regular advising and attending staff. There is no special arrangement made whereby this attending staff serve the hospital; they just come when the patients call for them. The hospital is open, or the operating room, to any doctor who wishes to operate there, or patients can select any doctor they wish to treat them in that hospital."

And in this same connection Sister Wendelinus, after stating that the Santa Rosa Infirmary Corporation paid during 1918 an assessment of $3,800 to the Mother House of the Sisters of Charity of the Incarnate Word, in Alamo Heights in San Antonio, for the purpose of training young members of the Sisters of Charity to become future Sister nurses, testified:

"The Santa Rosa Infirmary Corporation pays no contributions to any institution, charitable or otherwise, of the Sisters of Charity of the Incarnate Word, only this assessment for the training of its own members; that is all. * * * During 1918 we had already made our plans for the new annex, which was completed in 1921; we started a building fund for that purpose. Under the present system of operation, in the event that our profits are sufficient, or more than sufficient, to take care of the expenses of operation, and the payment on the building fund, under the charter, and under the rules of our organization, all the profits have to be turned into the institution for improvements and maintenance; besides, the Santa Rosa has such a big debt that it will take years to pay the notes and the interest, and it is the rule of the organization that all profits would be turned into a building fund for improvements and maintenance, and the other items of expense."

While not considered of necessarily determining importance it appears that, during 1919, 2,027 patients were treated in St. Luke's Clinic as free or charity patients for eye, ear, nose, and throat troubles, and 2,919 patients were received in the hospital for other treatment, of which 2,590 were full pay patients, 123 part pay patients and 206 were charity cases. In addition to this, 5,316 visits were made by the Sisters to outside patients for which no charges were made, and 7,200 free meals were furnished to indigent outsiders.

With respect to the admission of charity patients no obstacle appears to have been placed in the way of their reception other than a requirement that statements of the applicants, or of other trustworthy persons, be furnished at the time of their admission, to fairly indicate that they were objects of charity and unable to pay for the services rendered them, and, while no claim was made that sick or afflicted were sought out to be made the recipients of charity, it does appear that the infirmary was available and open to those who applied for free treatment.

The general operation and control of the entire enterprise was in the hands of about 50 of the Sisters of Charity designated for that purpose by the parent corporation, and these Sisters served without pay or compensation other than their meals, rooms, and clothing and their necessary incidental upkeep, and burial at death, and had no beneficial interest in the corporation other than to be cared for in sickness and when through age or infirmity they become unable to render further services.

The Constitution of this state, after providing (section 1, art. 8) for the general equality and uniformity of taxation, makes only one specific exemption from taxes, and that, $250 of household and kitchen furniture to each family in the state.

Section 2 of the same article, as amended in 1906, authorized the Legislature to provide by general law for the exemption of certain property, and, in so far as the section has any relation to the question under discussion here, has, for clearer understanding of its purpose, been paraphrased by previous decisions of the Supreme Court as if reading:

"'* * * But the Legislature may, by general laws, exempt from taxation * * * all buildings used exclusively and owned by * * * institutions of purely public charity.'" Morris v. Masons, 68 Tex. 698, 5 S. W. 519; City of Houston v. Benevolent Ass'n, 230 S. W. 978."

Subdivision 6, article 7507, under which the exemption here is claimed, is as follows:

"6. *Public Charities.*—All buildings belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions not leased or otherwise used with a view to profits, unless such rents and profits and all moneys and credits are ap-

propriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. An institution of purely public charity under this act is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members when in want, sickness and distress, and provides homes for its helpless and dependent members and to educate and maintain the orphans of its deceased members or other persons."

[3] Exemptions from taxation are never favored, and in the construction or interpretation of a law extending exemption from taxation to any citizen or class of property all doubts are resolved against the exemption. Morris v. Masons, 68 Tex. 703, 5 S. W. 519; 23 R. C. L. 313.

[4] As the constitutional provision (section 2, art. 8) expressly makes null and void all exemptions attempted thereunder by the Legislature, not authorized by the constitutional provision itself, if the property here comes within the exemption, it can be so not only because clearly embraced within the constitutional authorization, but as well within the statutory exemption made in pursuance thereof as the constitutional provision is not self-enacting, and only is a mere authorization. Morris v. Masons, supra; City of Houston v. Scottish Rite Benev. Ass'n, 111 Tex. 191, 230 S. W. 978.

[5] In Red v. Johnson, 53 Tex. 284, it was held that an exemption of a building claimed to be used for educational purposes failed, because it was not wholly so used, in that some members of the teacher owner's family occupied some rooms for residence purposes. But the constitutional provision with reference to buildings used for educational purposes requires that the property be "used exclusively for school purposes," thus by express language providing a limitation not employed in its reference to the buildings of charitable institutions.

In the case of Morris v. Masons, 68 Tex. 703, 5 S. W. 519, it appeared that a three-story building in Austin owned by a Masonic body claiming to be a purely charitable organization, while partially used by the order, was largely leased to tenants from whom rentals were collected.

At the time of that decision the constitutional provision authorizing the exemption from taxation of purely charitable institutions was the same as now, but the legislative provision thereunder was much more restrictive, reading as follows:

"All buildings belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions, not leased or otherwise used with a view to profit, and all moneys and credits appropriated solely to sustaining such institutions." Subdivision 6, art. 4673, Rev. Stat. 1879.

In stating the question there for decision, Justice Gaines said:

"If it can be shown that property belonging to a charitable association, not directly and exclusively used by it in furtherance of its charitable purposes, but partly rented for profit, though its revenues be exclusively devoted to the objects of the charity, is not exempt from taxation in our state, it will be unnecessary to determine whether or not the appellee [the Masons] can be deemed 'an institution of purely public charity,' as those words are used in our Constitution."

The determination in that case that the mere renting of a part of its building for profit deprived the order of the characteristic of a purely public charity was justified by the legislative construction above quoted, and it is quite clear that at such time under the legislative provision the mere receipt of rents or profits from the property claimed to be exempt operated to disqualify the institution as one entitled to the exemption.

But, as subsequently amended, and as it appears now as subdivision 6, art. 7507, of the statute, a manifestly more liberal attitude was displayed by the Legislature, and there was added to the subdivision as originally existing, and following the phrase, "not leased or otherwise used with a view to profit," the following language:

"Unless such rents and profits * * * are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves," etc.

If this language is to be given effect, it seems the Legislature contemplated that in aid and furtherance of their work charitable institutions might derive as an incident of the administration of their charities rents and profits where they were devoted directly and solely to those very charities.

But, as the Constitution requires the property, as a prerequisite to its right to exemption, to be exclusively used by the charitable institution, it is apparent, if any part of it is rented out and the relation of landlord and tenant created, that very fact would necessarily destroy the exclusive use necessary to be retained by the owner to bring its property within the plain terms of the Constitution, and it has been therefore held, as it was in that case, and in State v. Settegast (Tex. Com. App.) 254 S. W. 925, that the leasing of all or any part of a charitable institution's property to those not themselves engaged in a wholly charitable work, or the occupancy of even a part of the property by others under what amounts to an equivalent

situation (City of Houston v. Scottish Rite Association, 111 Tex. 191, 230 S. W. 978), destroys the exempt character of the property, and it is plain that in those cases there could have been no other holding.

The constitutional requirement is twofold; the property must be owned by the organization claiming the exemption; it must be exclusively used by the organization, as distinguished from a partial use by it, and a partial use by others, whether the others pay rent or not. City of Houston v. Scottish Rite, etc., supra.

[6] No question is raised here of the ownership of the property, and it seems to us that the exclusive use of it by the Sisters of Charity of the Incarnate Word is equally as indisputable. It was a hospital enterprise, and as such necessarily presupposed patients, surgeons, drugs, nurses, surgical equipment, clinics, and the usual accompaniments of such an institution. Notwithstanding the presence of all these in and about the premises the hospital was exclusively used by its owners for its avowed purpose of a general hospital, just as effectually as a hotel could be said to be exclusively used by its proprietor, notwithstanding guests who paid for their rooms occupied them.

There is no claim here that any part of the hospital building was leased out in the ordinary sense, but it is insisted that, because the major part of the rooms in the hospital were used to take care of pay patients, and because surgeons, not themselves engaged wholly in a charitable work, were permitted to use the operating rooms for certain fixed charges imposed upon their patrons able to pay, and because a certain ward was devoted to the charitable work of St. Luke's Clinic, and because the dispensary or small drug store in the building sold drugs to its pay patients for a profit, the use of the property by the Sisters of Charity became thereby nonexclusive by them, and also deprived the organization of its characteristic as a purely public charity. The Constitution does not in terms require a charitable institution, if it may claim exemption from taxation, to use its buildings exclusively for charitable purposes, as it does require in the case of educational institutions that they be used exclusively for educational purposes, but the requirement is only that the buildings be used by the charitable institution, as heretofore pointed out. St. Luke's Clinic was wholly charitable, and was conducted by the very same Sisters who controlled and operated all the remaining part of the hospital activities. It was the same owner under a separate designation merely treating eye, ear, nose, and throat troubles of charity patients exclusively, as distinguished from the remaining general hospital work of the institution for both its pay and charity patients. The operation of the drug store in the building seemed in its

net result to be a losing rather than a profitable venture. It furnished drugs only to the patients of the hospital, for pay and profit to those able to pay, and free to its charity patients. It was also operated exclusively by the same Sisters conducting the general enterprise. Since it is clear and undisputed that, notwithstanding charges were made, where patients were able to pay, for rooms, nursing, and incidental use of the operating rooms, all charity patients who applied for treatment and operations were received without regard to poverty or riches, creed, station, or color, and without the imposition of such conditions as to unreasonably, or even in any substantial effect, amount to a denial of the facilities of the hospital to objects of charity, the mere fact that pay patients largely predominated over the charity patients, or that the institution did not go out into the highways and byways seeking out those to whom its charitable offices might be extended, could not, under the great weight of authority, be said to so detract from its charities as to disqualify it as an institution of purely public charity.

In New England Sanitarium v. Inhabitants of Stoneham, 205 Mass. 335, 91 N. E. 385, a case was presented where the institution was largely maintained by pay patients, but where charity patients were also received, it was said, referring to previous decisions of that court in Franklin Square House v. Boston, 188 Mass. 409, 74 N. E. 675, and Thornton v. Franklin Square House, 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 486:

"The increase of charitable funds, through receipts from patients or inmates who are able to pay wholly or partially for benefits received, does not change a home for aged people, or hospital, organized and conducted as a charity, into a private association, maintained for the pecuniary advantage of the promotors. The original eleemosynary character of the institution is not transformed by this patronage, even if sufficient to relieve it from financial burdens, but the charity as established remains unaffected. Gooch v. Association for the Relief of Aged Females, 109 Mass. 558, 576; McDonald v. Massachusetts General Hospital, 120 Mass. 432, 435, 21 Am. Rep. 529; Thornton v. Franklin Square House, 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 486; Blake v. Mayor of London, 18 Q. B. D. 437; Cawse v. Nottingham Lunatic Hospital [1891] 1 Q. B. 585, 590, 592."

In the case of Sisters of Third Order of St. Francis v. Board of Review, 231 Ill. 317, 83 N. E. 272, very similar in its facts to the instant case, in that 89 per cent. of its patients were pay patients, 5 per cent. charity patients and 6 per cent. partially charity cases, under a provision of the Constitution of that state authorizing the Legislature to exempt from taxation property * * * used exclusively * * * for charitable purposes," and under a legislative enactment

exempting "all property of institutions of public charity, when actually and exclusively used for such charitable purposes, not leased or otherwise used with a view to profit," after stating that the corporation had never paid any dividends or profits and had no such purpose, it was said:

"In this hospital charity is extended to all the members of the community, and is not confined to any particular class of individuals. It is an institution of public charity; and where an institution devoted to beneficence of that character is, under the law, exempt from taxation, it does not lose its immunity by reason of the fact that those patients received by it who are able to pay are required to do so, or by reason of the fact that it receives contributions from outside sources, so long as all the money received by it is devoted to the general purposes of the charity, and no portion of the money received by it is permitted to inure to the benefit of any private individual engaged in managing the charity. City of Philadelphia v. Pennsylvania Hospital, 154 Pa. 9, 25 Atl. 1076; Sisters of Charity v. Corey, 72 N. J. Law, 426, 61 Atl. 387; Contributors to Pennsylvania Hospital v. Delaware Co., 169 Pa. 305, 32 Atl. 456; McDonald v. Massachusetts General Hospital, 120 Mass. 432, 21 Am. Rep. 529."

And further:

"It is then argued that this hospital should not be held to be an institution of public charity by reason of the great disparity between the number of charity patients and those who pay for the care and attention they receive at this institution. This objection seems to us without merit, so long as charity was dispensed to all those who needed it and who applied therefor, and so long as no private gain or profit came to any person connected with the institution, and so long as it does not appear that any obstacle, of any character, was by the corporation placed in the way of those who might need charity of the kind dispensed by this institution, calculated to prevent such persons making application or obtaining admission to the hospital. The institution could not extend its benefactions to those who did not need them, or to those who did not seek admission."

And also:

"It is also contended that the nurses, who are educated in the training school conducted in the hospital, receive training fitting them to pursue a profitable business for their private benefit, and that for this reason the hospital is not a public charity. It seems that the students in this training school receive board and instruction in exchange for assistance rendered in caring for patients and in doing other work about the building. It does not appear that the value of that which they so receive is greater than the value of the service which they render, and there is therefore no merit in this contention.

"We conclude that the property of this corporation is, within the meaning of our statute, property of an institution of public charity actually and exclusively used for such charitable purposes and not leased or otherwise used with a view to profit."

Section 170 of the Constitution of the state of Kentucky authorized the Legislature to exempt from taxation "institutions of purely public charity," and thereunder the Legislature did exempt the property of "institutions of purely public charity * * * not used or employed for gain by any person or corporation."

The case of City of Dayton v. Trustees of Speers Hospital, 165 Ky. 56, 176 S. W. 361, L. R. A. 1917B, 779, Ann. Cas. 1917B, 275, presented a state of facts where the major proportion of patients were pay patients and where over a period of four years there arose a small surplus over the costs of operation, which profit did not inure to the private gain of any one, but was employed in furtherance of the hospital organization's charitable purposes. There it is said:

"This court, in Trustees of the Kentucky Female Orphans' School v. City of Louisville, 100 Ky. 470, 36 S. W. 921, 19 Ky. Law Rep. 1091, 40 L. R. A. 119, and in Widows' and Orphans' Home of Odd Fellows v. Commonwealth, 126 Ky. 386, 103 S. W. 354, 31 Ky. Law Rep. 775, 16 L. R. A. (N. S.) 829, quoted with approval from the case of Episcopal Academy v. Philadelphia, 150 Pa. 565, 25 Atl. 55, wherein it laid down, among others, the two following rules by which to determine whether an institution was one of purely public charity:

"First. Whatever is done or given gratuitously in relief of the public burdens or for the advancement of public good is a public charity. Where the public is the beneficiary, the charity is public, and where no private or pecuniary return is reserved to the giver or to any particular person, but all the benefits resulting from the gift or act go to the public, is a purely public charity; the word 'purely' being equivalent to 'wholly.'

"Third. An institution founded and endowed as a purely public charity does not lose its character as such, under the tax laws, if it receives a revenue from the recipients of its bounty sufficient to keep it in operation.

"In the case of Gerke v. Purcell, 25 Ohio St. 229, the Ohio Supreme Court said:

"'When the charity is public, the exclusion of all idea of private gain or profit is equivalent, in effect, to the force of "purely," as applied to public charity in the Constitution.'

"Another test of purely public charity is the object for which it was founded. If it was for the general public good and not for private gain, and was so conducted that the public received all the benefits of it, it is a purely public charity. Donohugh v. Library Co., 86 Pa. 306."

And further, it was said:

"While a charge is made against every patient other than the ones who are consigned there by the county or cities, it does not appear that any one has ever been turned away or excluded from its benefits because of poverty or inability to pay for the benefits. Private patients are received, who pay the institution for their rooms, boarding, and nursing, and pay their physicians for their treatment, but the funds received from this source are all de-

voted to the general expenses of the hospital. A building and grounds and furniture are not adequate to maintain a hospital. The nurses must be paid, fuel and lights, water and food provided, and some one to superintend and direct the operations of the hospital. The fact that the institution receives a revenue from the recipients of its bounty sufficient to keep it in operation does not take from it its character as a purely public charity, where it was founded and endowed as such, and when all of the receipts go to providing for the purposes for which it was erected and maintained."

Article 16, § 5, of the Arkansas Constitution, authorizes the exemption from taxation of "buildings and grounds and materials used exclusively for public charity," and the legislative exemption thereunder (Crawford & Moses' Dig. Ark. § 9858, subd. 7) is "all buildings belonging to institutions of purely public charity together with the land actually occupied by such institutions, not leased or otherwise used with a view to profit, and all moneys and credits appropriated solely to sustaining and belonging exclusively to such institutions," it thus appearing that the statutory exemption is more restrictive than our own.

In the case of Hot Springs School District v. Sisters of Mercy, 84 Ark. 497, 106 S. W. 954, the Supreme Court of that state had before it a state of facts substantially identical to those presented here, and there, after saying:

"It is well settled that no one can exempt his property from taxation simply by the exclusive use of the income for public charity, for that is a matter which appeals to his own individual spirit of benevolence. It may be given to-day and withheld to-morrow. But a different rule prevails where the property is directly and exclusively used for that purpose. It is not denied that the whole object of the institution of appellee is one of public charity, but appellant claims that it is not exclusively so used because pay patients are received and because those able to pay are charged for prescriptions,"

—and quoting from State ex rel. Alexian Bros. Hospital v. Powers, 10 Mo. App. 263, that "the fact of receiving money from some of the patients does not, we think, at all impair the character of the charity, so long as the money thus received is devoted altogether to the charitable object which the institution is intended to further," the court said:

"In the case of County of Hennepin v. Brotherhood of Gethsemane, 27 Minn. 460, 8 N. W. 595, 38 Am. Rep. 298, the court said: 'A hospital, with the necessary grounds, free to all who are not pecuniarily able, and supported partly by private contributions and partly by fees from patients, but producing no profit, is a purely public charity.' In the case of Penn. Hospital v. Delaware Co., 169 Pa. 305, 32 Atl. 456, the court said: 'Property which is used directly for the purpose, and in the operation of the charity, is exempt, though it may also

be used in a manner to yield some return and thereby reduce the expenses.' To the same effect, see Sisters of Charity v. Township of Chatham, 52 N. J. Law, 373, 20 Atl. 292, 9 L. R. A. 198; Mount Hermon Boys' School v. Gill, 145 Mass. 139, 13 N. E. 354; Episcopal Academy v. Philadelphia, 150 Pa. 574, 25 Atl. 55."

The conclusion of that court was that the property there under consideration was exempt.

Under a federal internal revenue statute, 4 Fed. Stat. Ann. (2d Ed.) pp. 245–252; 38 Stat. at Large, chap. 16, pp. 172–180, exempting from tax the income of corporations "organized and operated exclusively for religious, charitable, scientific or educational purposes, no part of the net income of which inures to the benefit of any private stockholder or individual," it has just recently been held by the United States Supreme Court in the case of Trinidad v. Sagrada Orden de Predicadores, 44 Sup. Ct. 204, 68 L. Ed. 223, that a corporation sole, of an ancient religious order of similar character to the one here under consideration, does not forfeit its exemption by reason of incidental earnings and profits arising from its general charitable operations, where none of its members share in the profits.

There are undoubtedly some cases indicating a contrary view, and they have been considered, but we have been cited to none which, under what may be fairly said to be similar facts to those here presented, could be said to forcefully support a different holding. It would serve no useful purpose to analyze opposing opinions, but it may be said of the case of Appeal of Scottish Rite Building Co. v. Lancaster County, 106 Neb. 95, 182 N. W. 574, 17 A. L. R. 1020, cited as a principal authority by defendants in error, that both the Constitution and statute of Nebraska (Const. art. 9, § 2; Rev. St. 1913, § 6301) require buildings to be "used exclusively for * * * charitable purposes," before they shall be exempt from taxation, in addition to which it appears from that decision, and is stated that "all but a negligible amount" of the rents and profits from the Scottish Rite Cathedral there under discussion "was spent upon the building and in banquets and entertainments for its members and initiates," thus clearly differentiating it both upon the fundamental law and the facts from the instant case. And so believing that both reason and the great weight of authority sustain such a view, we hold here that the mere fact that pay patients predominate over those unable to pay, and that charges are made for drugs furnished those of the patients able to pay for them, and that charges are made against those able to pay for the use of the operating rooms, does not destroy or impair the exclusiveness of the use of the property by the Sisters of Charity, nor does it change

the character of the institution from one of purely public charity.

While it is stated in City of Houston v. Scottish Rite, etc., supra, that, in order to maintain its status as a purely charitable institution, an organization claiming to be such, and asserting an exemption from taxation, must make no private gain or corporate profit, nothing more was intended than that no private individual should reap a profit, or where a corporation was the owner that no distributable earnings in the shape of dividends must accrue.

[7] It is argued that to hold corporations of this character free from taxation will result in their accumulation of large estates and is unfair to competitive business enterprises of similar character which are required to pay taxes, but the answer is that, not only is the field of charity broad, but it is always within the power of the Legislature to curtail or wholly withdraw the exemption at its pleasure.

[8] But yet, if it may be said, within the purview of the Constitution to be a purely public charity, is it such an institution within the legislative definition thereof? A consideration of the legislative provision develops that at least two concurrent situations must exist: (1) The dispensation of its charities both to its members and others in sickness, distress, and death must be without regard to poverty or riches of the recipient; and (2) its property and assets must be placed and bound by its laws to relieve, aid, and administer in any way to the relief of its members when in want, sickness, and distress, and provide homes for its helpless and dependent members.

The first requisite above mentioned plainly exists from all the testimony, and that its assets are appropriately bound by both corporate charters to the exclusive purposes of their general charitable declarations and intentions, seems equally true. The corporations here were not organized for profit. They have no capital stock—no private or corporate gain can accrue. By their very incorporation for purely charitable and benevolent purposes they have made a contract with the state and with the beneficiaries named in the charters effectually constituting those in charge of the enterprise trustees of an express trust, and their charters in their last analysis and in their legal effect become declarations of trust. It would serve no useful purpose to quote from the numerous authorities sustaining this view, but the following are cited: Amer. & Eng. Ency. of Law (2d Ed.) 898; Linton v. Brown's Adm'rs (C. C.) 20 Fed. 455; 2 Moravetz on Corporations, § 1046; 1 Perry on Trusts (6th Ed.) § 82.

By article 1136 of the Revised Statutes any renewal of their corporate existence must continue the purposes originally stated.

Any beneficiary of the trust created by the charters could prevent, and so might well the representatives of the state government enjoin, a use or appropriation of the trust estates of the corporations for purposes of private gain or those inconsistent with their charter provisions. Cook on Corporations, vol. 2, § 492; Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629; 2 Perry on Trusts (6th Ed.) §§ 732–734; Atty. Gen. v. Garrison et al., 101 Mass. 233; Parker, etc., v. May et al., 5 Cush. (Mass.) 336.

[9] But there yet remains another question: While holding that the institution under consideration is within both the constitutional and statutory meaning of a purely public charity, it is quite apparent from the quoted testimony that the net result of its operations was the acquisition of a profit. However charitable and benevolent the corporations may be, they yet are exempt from taxation only when their profits are solely appropriated (1) to sustain the institution; (2) for the benefit of the sick and disabled members and their families and the burial of same; and (3) for the maintenance of persons when unable to provide for themselves. The testimony is that these profits were devoted to the following purposes, viz.:

"(a) For the maintenance of the infirmary, upkeep; (b) improved facilities; (c) debt and interest; (d) assessment of $3,800 paid to Mother House for training of future nurses intended to become members of the Santa Rosa Infirmary Corporation; (e) support of aged and disabled members; (f) a building fund to be used in the construction of an addition to the present hospital, or a new building for hospital purposes upon the same real estate upon which the present building is located."

We have been cited to no authority from any jurisdiction, possessing similar constitutional or statutory provisions to our own holding, nor have we been presented with any reasoning plausibly justifying the conclusion, that a charitable institution to be exempt from taxation must necessarily be founded exclusively upon gratuities or donations, or that it loses its exempt status because it goes in debt for its plant and pays that debt, and the interest accruing on it, out of its incidental earnings, and certainly there is no language in our Constitution or statute warranting such a determination.

The theory upon which institutions of this character are exempted from taxation is that they serve the government by relieving it to some extent of what would otherwise be a public duty or governmental function to care for the indigent sick and afflicted, and it is the assumption by such institutions of this burden which compensates the government for the exemption granted them from the general obligation resting upon all citizens to pay taxes. It is therefore essentially to the general public interest that the facilities

of these institutions to carry on this burden be extended by additions, new structures, and building funds, looking to that end and keeping pace with a growing population and its necessarily increasing demands for charitable dispensations.

Fifty Sisters of Charity, here, as the proof shows, serving without other compensation than the satisfaction of good deeds done, neither asking nor expecting temporal reward, are wearing out their lives in the service of this institution as nurses, and in other necessary capacities connected with the work. It is necessary, if the organization continues to function and endure, that younger women be trained to take their places as age and infirmities disqualify, or death removes those now serving, and the funds expended for training the future nurses is certainly within the proper upkeep and maintenance requirements of the institution.

With respect to all other expenditures made out of the profits, there can be no question of their being within the statutory requirements.

There is nothing in the record from which it may be inferred that any of the profits are being utilized for any purposes other than those well within the scope and purpose of the charities and benefactions of the hospital enterprise itself, as distinguished from a situation where profits arising out of the conduct of one charity are devoted to a different, segregated, or unrelated charitable purpose.

We conclude, therefore, that the trial court was correct in its judgment denying the claim of defendants in error for taxes, and accordingly recommend that the judgment of the Court of Civil Appeals be reversed and that of the district court affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

&⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes