

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

March 16, 1962

Honorable Charles J. Lieck          Opinion No. WW-1277
Criminal District Attorney
  of Bexar County                   Re: Exemption from ad valorem
County Courthouse                        taxes of Morningside Manor,
San Antonio 5, Texas                     Inc.

Dear Mr. Lieck:

In connection with your request for an opinion of this office on the above captioned matter, we have been advised of the following facts. Morningside Manor, Inc., hereinafter referred to as the Home, is incorporated under the Texas Non-Profit Corporation Act for charitable and benevolent purposes. We quote the following excerpt from the brief which has been submitted by the attorneys for The Home in support of their claim that the Home should be exempt from the ad valorem taxes on the basis of being a purely public charity:

"... /Morningside Manor/ is a project of the San Antonio District of the Methodist Church. Said district has a board on homes for older adults in its organizational structure. This board is incorporated as the San Antonio District Board on Methodist Homes for Older Adults and is the parent corporation.

"Morningside Manor, Inc. has purchased 20.325 acres more fully described in the application for exemption, and has virtually completed construction of improvements thereon. Opening ceremonies and occupancy began in September 1961. The improvements consist of one building designed to house 109 residents.

"The present requirements for admission constitute the requirements under which all existing residents have been admitted. As quoted in said Exhibit A of the application for exemption, section five of the by-laws is very clear in stating that,

"'There is no admission fee, or fixed amount, for admission to the Home, but those who are financially able to pay for the cost of their

care shall be expected to do so on a basis
determined by the Board of Directors.  In any
case admission will be a matter of negotiation
and mutual agreement and each case will be
considered on its own merit.'

"No one is declined admission because of
financial inability to pay.  The directors
have attempted to determine what it will
cost to operate the Home and have estimated
a cost of $214.50 for one person in a single
room, $182.38 each for two persons in a double
room, and $194.75 each for two persons in a
suite.  These figures are expected to under-
write the cost of furnishing their living
quarters, all meals, and a complete staff,
including an administrator, a full time
director of social activities, and four full
time nurses plus one part-time nurse, all of
whom are either registered nurses or licensed
vocational nurses.  Not every elderly person
has need of such facilities, but for those
who do, the Methodist Church feels their need
to be equivalent to the need of orphans, unwed
mothers, and the sick and needy who require
hospital care.  This Home is a sincere attempt
to meet such need.  All residents are asked to
pay what they can, and because it is non-profit,
many can afford to pay the full cost of their
care.  It is not expected that any person will
be in such dire financial circumstances as to
require full charity due to the fact that most
people are eligible for old age assistance,
social security, etc.  However, should a case
arise, the Home would not hesitate to provide
a member with 100% charity.

"The experience of other homes for older
adults across the nation has shown that quite
often emergency financial needs result in
connection with the last illness and death
of its members.  Quite often these needs cannot
be met by the member and even though they are
not within the scope of services furnished by
the Home, the Home has little choice but to pay
for the necessary items.  Consequently, it has
become a sound practice in such homes to request
payment in advance of a sum, when possible, to
help indemnify the Home should it be caught in
such a situation.  If no financial burden is

imposed on the Home, the resident or his estate.has a credit and right to receive from the Home an amount equal to the initial payment. Morningside Manor has such a program and that portion of the contract applicable thereto is as follows:

"'On this date the undersigned Member has paid _____ Dollars ($_____) to the Manor to provide against any contingency which may arise that would result in a pecuniary responsibility of the Member and which is not otherwise disposed of. The Member agrees in advance to be bound by and hereby ratifies the decisions of the duly authorized person or persons acting for the Manor when it is decided that a charge against said contingency should be made.. Upon termination of residency, the Manor agrees to pay to the undersigned Member or his estate _____ Dollars ($_____) less any amounts withdrawn therefrom, if any. This payment shall be paid into the general fund of the Manor, and amounts payable by the Manor under this provision shall be paid out of the general fund. It is expressly understood that no fiduciary relation is created thereby.'

"The Methodist Church members have made contributions to help underwrite the cost of furnishing this facility and are going to continue to contribute to its support. Except for these contributions, the Home could not afford to operate. At the date of this writing, twenty-two persons have moved into the Home. Of these, three such members (13.6%) are charity residents, i.e. they pay only a fractional part of the estimated cost for their care. As the Home continues to fill, it is expected the percentage of charity cases will increase."

There is no substantial disagreement between the taxing authorities and the Home as to the facts. The brief submitted by the Criminal District Attorney in support of his position that Morningside Manor is not exempt from state and county ad valorem taxes contains a few facts in addition to those contained in the above quoted statement. The purchase price of the land involved was $42,894.90; and the cost of the building, $912,501.56, totaling $955,396.46. These costs to the date of completion came from individual contributions and the issuance of bonds.

Hereafter the Home will be supported from such contributions and the charges received from those residing in the building.

The entire 20.325 acres will be cleared and landscaped and the land, in addition to the building site and immediate campus, will be used by the residents for recreation and for vegetable and flower gardens. Exemption has been requested for the entire tract of land.

We have carefully examined the briefs submitted in connection with your request. We have concluded that, with certain limitations, the property in question is exempt from taxation.

Article VIII, Section 2 of the Constitution of the State of Texas has empowered the Legislature to exempt from taxation certain enumerated properties, among which are ". . . institutions of purely public charity". In pursuance to this particular constitutional grant, the Legislature enacted Section 7 of Article 7150, Vernon's Annotated Texas Statutes, which effectuates exemption to the extent of the exemptive powers conferred by Article VIII, Section 2. Little Theatre of Dallas Inc. v. City of Dallas, 124 S.W.2d 863 (Civ.App. 1939); City of Wichita Falls v. Cooper, 170 S.W.2d 777 (Civ.App. 1943, error ref.); Dickison v. Woodmen of the World Life Insurance Co., 280 S.W.2d 315 (Civ.App. 1955, error ref.).

Section 7 of Article 7150 reads as follows:

> "Public charities. All buildings and personal property belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions not leased or otherwise used with a view to profit, unless such rents and profits and all moneys and credits are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. An institution of purely public charity under this article is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its law to relieve, aid and

administer in any way to the relief of its
members when in want, sickness and distress,
and provide homes for its helpless and
dependent members and to educate and maintain
the orphans of its deceased members or other
persons."

It is clear that under the above section an institution can
gain exemption for its "buildings. . . together with the lands
belonging to and occupied by such institutions" only if it is
an "institution of purely public charity."

In City of Houston v. Scottish Rite Benev. Ass'n., 111 Tex.
191, 198, 230 S.W. 978, 981 (1921), the court said that "the
Legislature might reasonably conclude that an institution was
one of 'purely public charity' where:  First, it made no gain
or profit; second, it accomplished ends wholly benevolent; and,
third, it benefited persons, indefinite in numbers and in
personalties, by preventing them, through absolute gratuity,
from becoming burdens to society and to the state."

Admittedly, the Home meets the first requirement since it
makes no gain or profit.  Does it accomplish ends wholly benevolent
and will it benefit persons indefinite in numbers by preventing
them from becoming burdens to society and the State?  In the
brief submitted in support of the proposition that the property
is taxable, it is argued that nineteen occupants are not faced
with the probability that they will become a public charge since
they are paying their room and board according to the schedule
before quoted, that three are partially doing so, that none are
on a "full and exclusive charity basis. . .," and that "neither
the Constitution or the courts have established a percentage of
charitable use as a basis for an exemption except 100 per cent."
We think that these arguments are refuted by the decision in
Santa Rosa Infirmary v. City of San Antonio, 259 S.W. 926 (Tex.
Com.App., 1924).

In the Santa Rosa case, the City of San Antonio and the
San Antonio Independent School District instituted suit against
the Sisters of Charity of the Incarnate Word, hereinafter
referred to as Sisters of Charity, and the Santa Rosa Infirmary,
hereinafter referred to as the Hospital, both incorporated for
charitable purposes, to recover taxes assessed against the real
estate and improvements thereon owned by the Hospital.  The
Hospital was a subsidiary of the Sisters of Charity and was
controlled by it in the management and operation of its property.

A Sister of Charity of the Incarnate Word became a member
of the Hospital when she was assigned to duty there by the
Congregation of Sisters of Charity.  The Sisters had no interest

in the corporation, received no compensation for their services except that rooms in the Hospital were furnished them when they became sick and that they received the expenses of their room, board, clothing and funeral expenses.

All patients whose financial condition permitted them to pay for the hospital services did so.  The money so received was used for the maintenance, upkeep and improvements of the Hospital facilities, for the liquidation of its debts, for the education and maintenance of young Sisters, future members of the Hospital, for the support of sick and disabled members of the Hospital, and the balance went to a building fund.  The Hospital had no other source of revenue than that which it derived from its pay patients. The Sisters of the Hospital engaged in other charities and charitable works.  They conducted St. Luke's Free Clinic, fed and clothed the needy, aided unwed mothers -- all of these additional charities being performed from the general funds of Hospital.   There was testimony to the effect that the large majority of patients were pay patients, that the applicants for charity were comparatively small in number, that the institution was entirely self-sustained and in no way dependent on any outside charity or solicitations from other organizations connected with the church.

The court discusses the case of Morris v. Masons, 68 Tex. 703, 5 S.W. 519 (1887) which held that a building owned by a Masonic body claiming to be a purely charitable organization was not entitled to exemption since the building was largely leased to tenants from whom rentals were collected.  The court therefore did not decide whether the Masonic body was, in fact, a "purely public charity."  The court distinguished the Morris case from the case under consideration on the ground that although the constitutional provision authorizing exemption was still the same, the statutory provision implementing the constitutional provision had been amplified to include rents and profits when appropriated by charitable institutions solely to sustain such institutions.  The court stated that if the language of the then controlling statute was to be given effect, charitable institutions might use funds derived "as an incident of the administration of their charities."  (Emphasis supplied)  The court expressly rejected the contention that the Hospital lost its status as a purely public charity because the majority of the rooms in the hospital was used to take care of pay patients and stated at page 932 that ". . . the mere fact that pay patients largely predominated over the charity patients, or that the institution did not go out into the highways and by-ways seeking out those to whom its charitable offices might be extended, could not, under the great weight of authority, be said to so detract from its charities as to disqualify it as an institution of purely public charity."

At page 935, the court said:

> "The theory upon which institutions of
> this character are exempted from taxation
> is that they serve the government by reliev-
> ing it to some extent of what would otherwise
> be a public duty or governmental function to
> care for the indigent sick and afflicted, and
> it is the assumption by such institutions of
> this burden which compensates the government
> for the exemption granted them from the
> general obligation resting upon all citizens
> to pay taxes. It is therefore essentially
> to the general public interest that the
> facilities of these institutions to carry
> on this burden be extended by additions, new
> structures, and building funds, looking to
> that end and keeping pace with a growing
> population and its necessarily increasing
> demands for charitable dispensations."

Both the State and Federal Governments are devoting attention to the ever increasing problem of the aged who constitute an ever increasing percentage of our population. We think it is self-evident that an aged person need not be wholly without financial means in order to become a public charge. The Home serves the Government by relieving it to some extent from what would otherwise be a public duty or governmental function to care for the aged, and may be deemed, therefore, an institution of "purely public charity" as those words are used in our Constitution.

Numerous decisions of our courts clearly establish the rule that in order to gain the exemption granted by Section 7 the "institution of purely public charity" must not only own the property for which exemption is sought, but must, in addition, make an actual, direct and exclusive use of said property for charitable purposes. City of Longview v. Markham-McRee Memorial Hospital, 137 Tex. 178, 152 S.W.2d 1112 (1941); Markham Hospital v. City of Longview, 191 S.W.2d 695 (Civ.App. 1945, error ref.); Santa Rosa Infirmary, supra; Benevolent and Protective Order of Elks v. City of Houston, 44 S.W.2d 488 (Civ.App. 1945, error ref.) In the brief submitted in support of the proposition that the Home is taxable, it is argued that the requisite of "exclusive use" is not met in this case since some of the rooms will be rented. We do not think that this fact is determinative of the "exclusive use" requirement but rather that that requirement is met by the fact that the property will be used exclusively for the charitable purpose of caring for the aged. We are unable to distinguish the occupancy of the Home by those aged persons who pay for their expenses and the occupancy of hospitals by pay

patients. Of course, any change in the existing factual situation which prevents the Home from meeting the threefold requirements of (1) ownership of the property, (2) bona fide charitable purpose as evidenced by actual charitable work, and (3) exclusive use of the property by the charitable institution itself would result in a loss of the exemption accorded by Section 7. The determination of these controlling facts must always be made by the proper local authorities in deciding whether exemption will be accorded.

## S U M M A R Y

Under submitted facts, Morningside Manor, Inc., a charitable corporation operating a Home for older adults in San Antonio, is an institution of purely public charity and is exempt from ad valorem taxes.

Yours very truly,

WILL WILSON
Attorney General of Texas

By Marietta McGregor Payne
Marietta McGregor Payne
Assistant

MMP:cm

APPROVED:

OPINION COMMITTEE:
W. V. Geppert, Chairman

J. C. Davis
Marvin Thomas
Bob Flowers
Elmer McVey

REVIEWED FOR THE ATTORNEY GENERAL
By: Houghton Brownlee, Jr.