# Richmond

STANLEY N. COLLINS, ET ALS. V. LYON, INCORPORATED, ET ALS.

March 8, 1943.

Record No. 2639.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*James H. Simmonds, Frank P. Dickey, J. A. Fridinger* and *John A. Tillema,* for the appellants.

*John S. Barbour, Harry R. Thomas* and *C. B. Garnett,* for the appellees.

Browning, J., delivered the opinion of the court.

As this case was heard and determined upon the bill, as amended, and the exhibits therewith filed and the demurrer of the defendants, these pleadings will be liberally quoted, that the action of the court, in sustaining the demurrer and dismissing the bill, may be more intelligently comprehended.

The complainants after alleging that they were holders of the record title to certain lots in the subdivision known as "Lyon Village", which are portions of a tract of 163 acres of land, which was dedicated to the establishment of the various sections of "Lyon Village", and which was acquired from what is known as the Cruitt estate, and after declaring the liability of the defendants, Lyon, Inc., and Charles W. Smith, Lawrence Michael and Frank Lyon, as agents and officers of Lyon, Inc., which is the corporate company formed to administer the affairs of "Lyon Village", set forth their case, *in extenso*, as follows:

"That the said Lyon, Inc., formerly known as Lyon & Fitch, Inc., during the period extending from, to-wit: March 1st, 1926, and up until, to-wit: May 17th, 1934, or later, contracted and obligated itself by sales contracts entered into with numerous purchasers of lots in the said Lyon Village, individual examples of which contracts are fully described in paragraphs following below,—that a Trust Fund for the benefit of the owners of the lots in the said subdivision of Lyon Village was being, and would be, accumulated by setting up on the books of the company ten per cent of the moneys paid to it or its assigns by the purchasers of lots in said subdivision; that this fund would be held and expended by the company until it sold or otherwise disposed of seventy-five per cent of the square feet in Lyon Village Sub-division,—which subdivision was to be created from and to include the 163 acre tract purchased from the Cruitt estate by the said Lyon, Inc., then known as Lyon & Fitch, Inc.; that when seventy-five per cent of said footage should be disposed of, or sooner, in the discretion of said company or its assigns, a Board of three Trustees should be chosen by

the lot owners to receive and administer such portion of the fund as might then be in hand and all that might accrue thereafter; and that your orators claim benefits thereunder upon their own behalf and upon behalf of all other lot owners in the said subdivision similarly situated and too numerous to be joined herein;

"That the provisions with respect to the establishment and accumulation of the above described Trust Fund contained in the contracts of the said Lyon, Inc., made with various purchasers of lots in the said subdivision, constituted and operated as an inducement to purchase, not only to the said purchasers but to many others intending or contemplating the purchase of lots in the said subdivision, who relied upon and were entitled to rely upon the provisions of the said contracts with respect to the creation of a Trust Fund; that the representations of the said Lyon, Inc., with respect to the said Trust Fund were not limited to the conditions and covenants in the aforesaid sales contracts but were publicized generally by the agents and officers of the said Lyon, Inc., and were held out to prospective purchasers as an inducement to buy lots in the said subdivision of Lyon Village and that as a result of such inducement and such representations, lots in said Lyon Village were sold to purchasers who relied upon and were entitled to rely upon the said conditions and covenants and the representations with respect thereto; that a sample prospectus of the said Lyon Village, issued by the said Lyon, Inc., then known as Lyon and Fitch, Inc.,—a partial copy of which is attached hereto, marked 'Complainants' Exhibit A', and prayed to be read as a part hereof,—describes the said Trust Fund," in the following language:

"Three Advantages    3.    Maintenance Fund"

"$250,000 provided to maintain property for ten years MAINTENANCE OF IMPROVEMENTS. Approximately a quarter of a million dollars, 10% of the cash price of all lots, is being set aside for the maintenance of the subdivision. This

means that should the present owners dispose of their interest in the property within a brief period, there will be left in the hands of trustees, a sufficient fund to maintain the property for approximately ten years. This maintenance will apply especially to streets, sewers, electric lights and to pay for legal services incident to the enforcement of restrictions covering this property.

"Out of this fund may also be appropriated not to exceed $5,000 toward the erection of a community house, the ground for which is donated for this purpose by Lyon & Fitch, Inc.

"Land has been set aside for parks and a civic center has been provided. In the midst of native trees and natural streams, an ample parking system is being provided, fully equipped with swings, sand piles, and other facilities for the amusement of children. A site will be dedicated for a community house." * * * "and that your orators claim rights created by the aforesaid inducements and representations, upon behalf of themselves and of other lot owners in the said subdivivsion, similarly situated and too numerous to be joined herein;

"That the said Lyon, Inc., then known as Lyon & Fitch, Inc., on or about, to-wit: the 29th day of July, 1933, did sell Lot No. 427, Section 1, of Lyon Village, to your orator, Stanley N. Collins; that prior to the signing and delivery of the deed of said lot, a sales contract,—a copy of which, marked 'Complainants' Exhibit B', is attached hereto and prayed to be read as a part hereof,—was entered into by and between the said Stanley N. Collins and his wife, Elsie B. Collins, of the one part, and Lyon & Fitch, Inc., by Frank Lyon, Pres., of the other part; that this contract contained, among other things, the following language:

"(e) Beginning March 1, 1926, a fund is being created for the purpose of (a) maintaining the streets, sidewalks, sewers, street lights, and other public or semi-public utilities of a like character, and (b) to defray the expenses of controversies in the courts or elsewhere concerning the enforcement of the covenants, conditions and restrictions specified

in the deeds to the several purchasers, and (c) to make a contribution not to exceed $5,000 toward the erection of a community house. The fund shall be accumulated by setting up on the books of the company ten per cent of the moneys paid to it or its assigns by the purchasers of lots.

"This fund shall be held and expended by the company until it has sold or otherwise disposed of seventy-five per cent of the square feet in Lyon Village which is to comprise the 163 acres purchased from the Cruitt estate.

"When seventy-five per cent of the said footage has been disposed of, or sooner, in the discretion of said company or its assigns, there shall be chosen by the lot owners (each lot to cast one vote) in Lyon Village a Board of three Trustees to receive and administer such portion of the fund as may then be in hand and all that may accrue thereafter. The trustees shall be chosen at a public meeting held for the purpose, provided representatives of a majority of the lots are present and indicate their choice in writing."

Similar allegations are made with respect to the contract between the complainant, Emil Rauchenstein and Lyon, Inc., although its terms differed in some particulars from those of the Collins contract, but they are not deemed of sufficient importance to our inquiry, for specification.

The relations between complainants Fridinger and Tillema, purchasers of lots, and Lyon, Inc., are set forth. Neither of them purchased under a sales contract. The former knew of the trust fund and of the other inducements, alleged, and was influenced by them in becoming a lot owner in the said subdivision.

The latter did not acquire his lot under a sales contract and he did not know of the trust fund and therefore was not induced thereby to purchase but he asserted a right to participate in the benefits of the fund with other lot owners in the subdivision. Each of the declarant complainants claimed the benefits upon behalf of himself and all other lot owners similarly situated but too numerous to be joined as plaintiffs in the suit.

It was alleged that the right in the trust fund ran with the land in favor of all lot owners in the subdivision to the extent of ten per cent of the selling price of all lots sold and of the sale value of all lots or other portions of the Cruitt tract otherwise disposed of or withdrawn from sale except such part or parts as had been dedicated to public uses, as streets, sidewalks, etc.

The rights as described were declared to constitute a trust for which all of the defendants, corporately and individually, are answerable to the lot owners, their successors and assigns.

It was further averred that the conditions of liability had come to pass, in that, seventy-five per cent of the land had been sold or otherwise disposed of, etc., and that the time had arrived, or presently would, for putting into effect the covenants and conditions by which the benefits of the trust could be enjoyed by the *cestuis que trustent*. It was alleged that the knowledge of the presence of the primary condition, that of the sale or disposition of the requisite quantity of the land, to bring into being the full amount of the trust fund, was gained by consulting the current report of the county commissioner of the revenue, whose duty among others, is to list the names of land owners and their lands.

It was further alleged that in the month of May, 1940, a committee had been appointed by the Lyon Village Citizens Association, composed of residents and lot owners in Lyon Village, to confer with the defendants, with the view of determining the amount in the trust fund and transferring the same to trustees, to be elected in accordance with the trust plan and to take such steps as would conserve and protect the interest of the lot owners. In addition a letter, written by a member of the committee, to Lyon, Inc., requesting a conference, resulted in the attainment of that end, but the meeting was unsatisfactory. The committee was informed that the trust fund was set up on the books of the company and a record of the sums due the fund was kept until the year 1935, but the moneys belonging to the fund were not segregated from the other funds of the company, and subsequently no record was kept; that seventy-

five per cent of the footage of the land had been sold but there was no money to be turned over to trustees, should they be selected for the purpose of receiving the same; that the defendants did not intend to perform to any further extent the terms of the conditions and covenants relating to said fund. It was alleged that a request was made that the committee be furnished an itemized statement of the receipts and disbursements of the fund and in response a letter was received from the defendants submitting therewith an account of what purported to be a statement of the operation of said fund. These letters were made a part of the bill as exhibits and are as follows:

June 29, 1940.

"Lyon, Incorporated,
Lyon Village,
Arlington, Virginia.
Sirs:

As your records will show, I purchased Lot No. 427, Lyon Village, Section 1, from you under the provisions of a "Contract of Sale" dated the 29th day of July, 1938, which contract was duly executed on behalf of your Corporation and myself. Since executing this contract I have fully complied with its provisions and have erected on the land purchased a brick dwelling.

My contract provided that 10% of the purchase price of all lots sold from the so-called "Cruitt Estate" shall be placed by you in a Trust Account, the monies in said account to be used for civic improvements as outlined in the "Contract of Sale", as supplemented by various pamphlets and other instruments used by you to promote the sale of lots in Lyon Village.

A Special Committee has been appointed by the Lyon Village Citizens Association, which committee is composed of Dr. John Tillema, Chairman, White, J. A. Fridinger, Monroe Stockett and myself, to contact you for the purpose of determining the amount now in the Trust Account and

to confer with you as to the transferring of the fund to the Trustees provided for in the "Contract of Sale".

I, therefore, request that we arrange a conference within the next two weeks in order that we may determine the status of the Trust Account; discover whether 75% of the lots in the Cruitt Estate have been sold, and make certain suggestions which we have in mind.

A reply within the next few days setting a date and time for a conference will be greatly appreciated.

Very truly yours,

STANLEY N. COLLINS, President,

Lyon Village Citizens' Association."

"LYON PARK                      Chestnut 7070

LYON      Tels.

LYON VILLAGE      INCORPORATED      Oxford 1650

Seal    1923

VIRGINIA

ARLINGTON, VA.

August 7, 1940.

Mr. Stanley N. Collins,
2715 North Key Boulevard,
Arlington, Virginia.
Dear Mr. Collins:

There are herewith enclosed figures concerning the maintenance fund which you requested in our interview a few weeks past. I also enclose a statement of our operating costs from 1926, to 1939, which, while not requested by you may be of interest.

Yours very truly,

LYON INCORPORATED

By CHARLES W. SMITH,

enc.                                      Secretary"

It was further alleged that the itemized statement accompanying the letter of Lyon, Inc., was unintelligible and specific points were indicated as desirable to be cleared up by another letter from the committee. This letter was alleged to have been ignored. It is as follows:

September 13, 1940.

"Lyon, Incorporated,
Lyon Village,
Arlington, Virginia.
Sirs:

Thank you for your letter of August 7th, to which was attached a statement dealing with the "Maintenance Fund" shown on your books in connection with the sale of lots in Lyon Village.

In order that we may better understand the figures shown in this statement, we would appreciate your advising us as follows:

1. Does $63,244.22 represent 10% of the sale price of lots sold from the so-called Cruitt Estate of 168 acres, or does it represent 10% of the sale price of lots sold from some smaller section of the Cruitt Estate?

2. Into how many lots has the Cruitt Estate been divided and of this number how many lots now remain unsold?

3. With reference to the sums charged to maintenance from the Trust Fund, we should like to have a detailed itemization of expenditures.

It appears that the figures you have given us include items which we indicated at our conference in your office should not be properly charged against the Trust Fund.

The committee which has been considering this matter is of the opinion that the differences which apparently exist between your office and it (relative to the Trust Fund) are so great that the most satisfactory method of settling the same would be by way of court action.

It did feel, however, that before resorting to an action for an accounting, it should give you every opportunity to explain matters satisfactorily.

We shall expect to hear from you within the next few days; otherwise, we shall assume that court action is the only feasible course and shall proceed accordingly.

Very truly yours,

STANLEY N. COLLINS, President,

Lyon Village Citizens Association,

2715 Key Boulevard."

It will be observed from this correspondence that the complainants were insisting upon their rights, as they conceived them, under the contracts and plan as publicized, but their efforts were fruitless.

It will also be noted that the letter from Lyon, Inc., to complainant, Collins, of August 7, 1940, contained no denial of the claims made, nor was any defense to them urged. A negligible compliance with the demands, or recognition of them, may be descried from the incomplete statement enclosed with the letter.

The bill further charged the defendants with having conspired and confederated to defeat the rights of the complainants—rights derived from the provisions of the contracts and plans—which the defendants not only sponsored but of which they were the authors; that the contracts created a trust running with the land and enuring to their benefit and that of all other lot owners, so circumstanced; that defendants had ignored their bounden obligation to keep accurate records of receipts and expenditures and had neglected their duties in all respects to the injury and harm of the lot owners and were seeking further to evade them, and that therefore they came seeking further to evade them, facts, and an accounting of the moneys due the trust fund or "maintenance fund" as it was called by the defendants, and asking that they be compelled to specifically perform all unperformed engagements obligatory upon them in the premises. The formal prayer of the bill was in accordance with its allegations, an epitome of which we have undertaken to set out.

The demurrer might be called an omnibus one for it enumerated eighteen grounds, all, or any of which, were urged as destructive of the bill as a legal and valid paper.

The court sustained it upon six grounds which may be said to incorporate the major points of defense. At the outset let us say, what is quite elementary, a demurrer in chancery operates as an admission that all averments of fact in a bill which are well pleaded are true. Encyclopedia of Pleading and Practice, Vol. 6, page 396.

(1) The Court thought there is, or was, a misjoinder of causes of action.

There was but one cause of action and that was *ex contractu,* in the sense of genesis. The bill sought the enforcement of a trust as to all the defendants alike. The other relief prayed for is incidental and the slightly different contractual relations, already noticed, do not materially differentiate the rights of the complainants, as to each other, as would make the objection sound. We said in the case of *Fulcher* v. *Parker,* 169 Va. 479, 194 S. E. 714:

"Where the matters in controversy are not absolutely independent of each, although distinct, and it will be more convenient to litigate and dispose of them in one suit, the objection on the ground of multifariousness should not prevail."

In Lile's Equity Pleading and Practice, page 168, we find this:

"In short, in order to render a bill multifarious, there must be two complete, independent causes of action asserted."

See also *Moorman* v. *Crockett,* 90 Va. 185, 17 S. E. 875; *Buchanan* v. *Buchanan,* 174 Va. 255, 6 S. E. (2d) 612.

See section 6102, Code of Virginia, 1936 (Michie).

In *Roanoke St. Ry. Co.* v. *Hicks,* 96 Va. 510, 32 S. E. 295, we said:

"The object of a bill of discovery in equity is to enable one party to search the conscience of his antagonist, and to compel him to make disclosure upon oath of facts necessary to the preservation of the rights of the former,

which he otherwise might not be able to prove. Corporations cannot answer under oath, but only under their common seal; and for this reason, in order to prevent a failure of justice, it has long been the settled law in this country and in England, when a discovery is desired, to make such of the officers of individual corporators as are supposed to be personally cognizant of the facts wanted, parties defendant along with the company itself."

(2) The court below also was of opinion that there was a merger of the various public representations in the written contracts and deeds subsequently executed.

The holding of this court in *Sale* v. *Figg*, 164 Va. 402, 180 S. E. 173 is decidedly to the contrary, wherein it referred with approval to a note in 84 A. L. R. 1008, on the subject: "Deed as superseding, or merging, provisions of antecedent contract imposing obligations upon the vendor."

In that note is the following:

"In this regard it is to be observed that a contract for a deed antedates the execution of the deed, and may, and often does, contain many provisions which the execution of the deed neither adds to nor takes away from. A deed is a mere transfer of the title, a delivery so to speak of the subject-matter of the contract. It is the act of but one of the parties, made pursuant to a previous contract either in parol or in writing. It is not to be supposed that the whole contract between the parties is incorporated in the deed made by the grantor in pursuance of, or as the consummation of, a contract for the sale of land. There are many things pertaining to the contract which it is manifest are never inserted in a deed. * * * The instrument of conveyance may be complete for its purpose, which is to declare and prove the fact of conveyance; yet very naturally and commonly it is but a part execution of a prior contract, and parol evidence is admissible to show the true consideration for which it is given and all other parts of the transaction, not inconsistent with the recitals in the deed, provided the fact of conveyance is not affected by it."

The cases of *Saville* v. *Chalmers*, 76 Iowa 325, 41 N. W. 30 and *Miller* v. *Fitchthorn*, 31 Pa. 252, 260, are cited by the annotator as authorities for the above.

■ The merger defense does not impress us as sound.

(3 & 4) We come now to the trust features which the trial court thought were dispositive of the case in that the alleged facts did not disclose a trust and that sought to be set up, if valid otherwise, would be void as a perpetuity.

This we would say goes to the heart of the case. It is the bending oar—the prop against which the defendants lean most heavily.

It is interesting to recite what an eminent text writer says of trusts.

Scott on Trusts, Vol. 1, page 1, section 1:

■ ■ "The trust, however, is a device for making dispositions of property, and no other system of law has for this purpose so flexible a tool. It is this that makes the trust unique. * * * A trust can be created for any purpose which is not illegal, which is not against public policy. * * * The purposes for which trusts can be created are as unlimited as the imagination of lawyers.

■ " * * * The uses of the trust, however, go far beyond the effecting of family settlements. The trust has been frequently employed in business transactions. As Professor Isaaca has said: 'Trusteeship has become a readily available tool for everyday purposes of organization, financing, risk-shifting, credit operations, settling of disputes, and liquidation of business affairs.' He also points out that "modern business has become honey-combed with trusteeship. Next to contract, the universal tool, and incorporation, the standard instrument of organization, it takes its · place wherever the relations to be established are too delicate or too novel for these coarser devices."

■ Unquestionably a trust is here disclosed and it is what is classified as a charitable trust. Let us see if this statement is fortified by authority deemed high in law.

In the case of *Wilson* v. *First Nat. Bank*, 164 Iowa 402, 145 N. W. 948, Ann. Cas. 1916 D 481, 485, is this:

■ "The word 'charity', as used in law, has a broader meaning and includes substantially any scheme or effort to better the condition of society or any considerable part thereof. It has been well said that any gift not inconsistent with existing laws, which is promotive of science or tends to the education, enlightenment, benefit or amelioration of the condition of mankind or the diffusion of useful knowledge, or is for the public convenience, is a charity."

■ *Idem*, page 486. "The charitable character of the trust being made apparent, all doubts will be resolved in its favor".

*Idem*, page 487. "We have no occasion to inquire into the wisdom of this gift or of the plan adopted for its administration. There is nothing in it which offends against the law, public morals, or public policy. The testator was acting within his undoubted right to select the beneficiaries of his estate, and the law and the courts are bound to respect his clearly expressed wishes".

■ There is nothing which we can perceive in the trust scheme before us, which was adopted by the defendants, which offends the law, public morals, or public policy, and does it not, if it becomes a verity by effectuation, tend to better the condition of a considerable portion of society, and is it not promotive of public convenience and needs, and happiness, and contentment. If it does, the blows aimed at it not only do not destroy its character and its being, but fall harmlessly at its feet.

In a note appended to the case, *In re Walkerly*, 108 Cal. 627, 41 P. 772, 49 Am. St. Rep. 97, 128; it is stated by the annotator:

■ "It is not necessary, to create a charitable use, that the fund be devoted to almsgiving. It may be for any purpose in which the public has an interest such as the promotion of education or knowledge or religion, or the spread of the truth, or the suppression of vice, as well as to make provision for the indigent, and when, for these purposes or any other which they deem charitable, a disposition of prop-

erty is made, the courts will favor the disposition and extend to it their aid".

See the numerous cases there cited in support of this.

Let us now inquire if the rule against perpetuities has any fitness or is applicable at all to the situation.

It will be perceived that here, whenever, a lot was purchased, there immediately vested in the purchaser a right in the fruits of the trust. And this we think the defendants fail to realize.

We find this in Professor Simes great work, The Law of Future Interests, Vol. 2, page 508, section 591:

"If a trust for charity is vested, a provision for accumulation of income is valid and will be effectuated so long as it is not unreasonable. As the Connecticut court recently said, in sustaining a charitable trust for an accumulation for a period of ninety-nine years: 'In the case of gifts to charities, the ordinary rule against accumulations does not apply, the only limitation being in the power of the court to take remedial measures should an unreasonable condition result." The argument for this position is about as follows: Charities are favored by the court. The charitable trust is subject to the directions of the court of equity; and, if the accumulation should become unreasonable, the court has power to direct the trustee to disregard it. Thus the charitable trust will be sustained, and objectionable features will be prevented by the control of the court.

In *Bennett* v. *Bennett*, 92 W. Va. 391, 409, 410, 115 S. E. 436, is this:

"Appellant makes the point that plaintiff's claim is void and unenforceable under the rule against perpetuities, in that under the agreement, plaintiff's claim or interest, at its inception is inchoate, executory and contingent upon the happening of conditions precedent, any one or all of which might or might not come to pass, namely, (1) the purchase of the land at the trustee's sale, (2) the subsequent resale by defendant at a profit. No time limit upon resale was agreed upon by the parties, but the time and terms of sale were left wholly to defendant. It is contended that under the

agreement plaintiff's inchoate interest might not have vested until twenty-one years and ten months after the death of the parties to the agreement. We think that plaintiff's interest in the land became vested and certain when the property was purchased at the trustee's sale. Whether it was in the land or in the proceeds of the land when sold, is immaterial. Although no time for resale was agreed upon, the law would not permit defendant to prevent a fruition of the contract by indefinite and eternal postponement. "Nothing is uncertain which is capable of being made certain." The element of uncertainty in the profits or losses has no relevancy to the rule against perpetuities. "The rule against perpetuities has reference to the time within which the title vests, and has nothing to do with the postponement of the enjoyment." 21 R. C. L., p. 290, sec. 12."

Prof. W. Barton Leach in Harvard Law Review, Vol. 51, at page 660, in writing on Perpetuities said:

"The Rule against Perpetuities is a rule of property law, not a rule of the law of contracts. It is no objection to the enforceability of a contract that the liability thereunder does not accrue until a time beyond the period of perpetuities. Thus insurance and suretyship contracts (both contingent obligations) are valid without reference to the time when the contingency may occur or payment may be required."

And all that has been so forcefully and well said by learned counsel for the defendants is, to our minds, staggered and crippled by a further observation of the above writer at page 658 of the volume above cited, where he is inveighing against the rule as applied to a testator who was said to have offended it:

"One starts with the inference that the testator (like Congress) intended to do a legal act rather than an illegal one, and one permits this basic intention to overcome inferences as to minor intentions, which would ordinarily be drawn from particular words, unless those words are clear. Such an attitude seems increasingly to represent the trend of American authority."

It is our considered conviction that the defendants, when they publicized the alluring features of becoming a lot owner and an inhabitant of that charming vicinage, Lyon Village, with parks and playgrounds, and springs and trysting places, and went even further and described an existing and growing fund of stately proportions to guarantee the future actuality of all these enticements, did not intend to paint a picture such as dreams are made of, but rather intended to set up a legal structure. They never intended to erect a house of cards to be knocked down but to present one founded upon a rock.

The Indiana court in *Scobey* v. *Beckman* (Ind. App.), 41 N. E. (2d) 847, 850, said:

"It follows, therefore, that if the devise in question is a charitable devise, it does not fall within the provision of the statute prohibiting the creation of perpetuities."

The facts of the case of *Skeen* v. *Clinchfield Coal Corp.*, 137 Va. 397, 119 S. E. 89, to which we have been cited, are so variant from those in the case we are considering, as to afford no help in solving our problem.

(5) We do not think that the contract merely creates a promise personal to Lyon, Inc., if by that it is meant to exculpate the officers and agents of the corporation from liability. That is yet to be determined.

(6) If there is no *res* to which a trust might attach, there ought to be. The complainants had a right to believe there was and would be one. They are in quest now of the reason why there is none and where the fault lies for its nonexistence.

The case of *West Texas Bank, etc., Co.* v. *Matlock* (Tex. Civ. App.), 172 S. W. 162, 163, 164 is so similar in some of its facts to the case, we have to decide that we will quote copiously from it.

The appellant, as the executor of Dr. C. T. Simmons, deceased, instituted a suit to recover from certain trustees, a trust fund of $50,000.00, received by them from certain other trustees, to whose credit in the bank the fund was deposited by Simmons as a trust fund to be paid to any

railroad company that might build and operate a railroad line through certain lands in Live Oak county and through Simmons City on said land in accordance with the terms and conditions laid down in a certain booklet circulated by said Simmons, entitled "Home, Sweet Home", and if no such railroad was built within a reasonable time, the money was to be returned to Simmons, his heirs or assigns. It was further alleged that in pursuance of rule 9 of the booklet, the trustees who were sued were two of those elected by the purchasers of the land to receive and hold the $50,000.00 bonus and it was alleged that more than a reasonable time had elapsed and that no railroad had been built and the executors of Dr. Simmons were entitled to the money.

A portion of the syllabus is informative as showing the temper of the court:

"Where an owner of land, in advertising it for sale, issued a pamphlet stating that a specified bonus would be given for the first railroad through the land, and that, if no railroad was running before the farm and lot distribution, the bonus would be turned over to trustees selected by the purchasers, to be by them given as a bonus to the first railroad, it was the trustees' duty to place the bonus on interest, and the interest became a part thereof, and the donor had no right thereto."

It appears that the trustees arbitrarily turned over the money to the estate, to the hurt of the rights of the purchasers of the land.

The purchasers of the land intervened to assert their rights, which the court of last resort held were paramount to the extent that the money should be held for the building of a railroad as indicated. The court said:

"The men who bought the land were not purchasers of only sunshine and soil and cactus and chaparral many miles from railroad facilities, but they bought the means of inducing the building of a railroad to their land, and cannot be deprived of it without their knowledge and consent. The documentary evidence was such that a verdict should have been instructed for appellees, on the ground that the

bonus was an absolute donation to the purchasers of the land, to be used for certain purposes."

\*    \*    \*    \*    \*    \*    \*

"We construe the contract between Simmons and the purchasers of his lands as giving them a vested interest in the $50,000.00, as hereinbefore set out, and the money should be held in trust by the trustees for the uses to which it was set apart."

The other grounds of the demurrer not mentioned in the decree of the court but enumerated by the defendants need not, we think, be considered for they may be said to be of a corollary nature to those we have discussed, at least, what we have said disposes of them as not possessive of merit in our opinion.

We reverse the decree of the trial court and remand the case for such action as it may be advised not inconsistent with this opinion.

*Reversed and remanded.*