No. 44,091

Topeka Presbyterian Manor, Inc., a corporation, *Appellee*, v. Board of County Commissioners of Shawnee County, Kansas; Darold Main, John R. Hiller, and Richard B. Hanger, as Commissioners Thereof; Myron H. Cushman, County Clerk of Shawnee County, Kansas; John Towle, County Assessor of Shawnee County, Kansas; and M. F. Leonard, Treasurer of Shawnee County, Kansas; and Alvin E. Jones, Director of Property Valuation of the State of Kansas, co-party defendant, *Appellants*.

(402 P. 2d 802)

Opinion filed June 12, 1965.

*Sard Fleeker* and *Lewis C. Carter,* both of Topeka, argued the cause and were on the brief for the appellants.

*A. Harry Crane,* of Topeka, and *C. Fred Ice,* of Newton, argued the cause, and *Warden Martin, Arthur L. Claussen,* and *Harvey D. Ashworth,* all of Topeka, and *Arthur N. Turner* and *Theodore B. Ice,* both of Newton, were with them on the brief for the appellee.

*Kenneth G. Speir, C. Fred Ice,* and *George A. Robb,* all of Newton, appeared as *amici curiae* for The General Conference Mennonite Church, Mennonite Board of Missions and Charities of Kansas, Inc., The Bethel Deaconess Hospital Association, Kansas Christian Home, Inc., and Friendly Acres, a Home of the Evangelical United Brethern Church, Inc.

The opinion of the court was delivered by

HARMAN, C.: This action was one initiated by the Topeka Presbyterian Manor, Inc., a corporation, hereinafter called Manor, to recover taxes paid by it under protest for a part of the year 1963, and to enjoin defendants, the taxing authorities of Shawnee County, Kansas, wherein Manor's property is located, from assessing and collecting taxes on such property and to have it removed from the tax rolls. After trial in the district court, but before overruling of motion for new trial, the Director of Property Valuation of the State of Kansas was permitted to intervene in the action as a co-party defendant.

The case was submitted to the trial court upon the pleadings and an agreed statement of facts which may be summarized as follows:

Manor is a nonprofit Kansas corporation, with no stock issued, and along with similar Manors located at Newton and Sterling, Kansas, is under the management of the United Presbyterian Foundation of Kansas, Inc., likewise a nonprofit Kansas corporation, which in turn is under the authority of the Synod of Kansas, the governing body of the affairs of the United Presbyterian Church of the United States of America for the State of Kansas; that upon dissolution of the Manor any net assets would never go to the resident members or contributors but would pass to the Foundation, whose assets in turn in case of dissolution would go to the Synod and not to any individual; that one of Manor's purposes, as expressed in its articles of incorporation, is to provide elderly persons on a nonprofit basis with housing facilities and services, especially designed to meet the physical, social and psychological needs of the aged, and to contribute to their health, security, happiness and usefulness in longer living; that the Manor was built and equipped with approximately $400,000.00 in gifts and a Federal Housing Administration secured commercial loan in the sum of approximately $1,000,000.00; that a State Board of Health survey shows that in August, 1963, certain named counties in Kansas paid for the care of welfare clients in adult care homes varying amounts from $200.00 per month to as high as $305.00 per month, and that the Shawnee County Welfare Department for private nursing home care pays $30.00 per month more than for those in church homes; that Manor makes an effort to secure an entrance fee of $2,000.00 and a minimum monthly payment for board and room, laundry and ordinary care, with sick ward provided, in the sum of $200.00 but

of the eighty-two persons in residence on January 31, 1964, eleven persons had paid no membership fee, three pay only the welfare rate and two others pay less than the desired minimum monthly charge; that preference is given for admission of members of the United Presbyterian Church but admission is not restricted to such members and on January 31, 1964, there were sixty-one Presbyterians and twenty-one persons of eight other denominations in residence; that a chapel is operated in conjunction with other facilities of the Manor with regular weekly religious services being held by staff members who are former pastors; also included in the facilities is an infirmary with room for seventeen patients with registered nurses on duty at all times.

Manor began operating August 1, 1963, and its operating statement for the first seven months showed an excess of receipts over disbursements in the sum of $8,341.28, the receipts including approximately $59,000.00 in gifts; that Manor's income from residents will not alone cover operating costs and make the required monthly mortgage payment and it will have to continue to receive gifts in order to operate; that the average monthly deficit in December, 1963, was the sum of $76.17 per person; that during construction application was made to the Director of Revenue for exemption from sales and compensating use tax upon the ground Manor would be a religious, charitable and benevolent operation, and such exemption was granted March 9, 1959; no individual profits from Manor's operation and only reasonable compensation is paid its employees; its Executive Director and Board of Directors receive no salary from Manor; that Manor was organized and its monthly rates set based on rulings of tax exempt status; that a companion home at Newton operated on the same basis was granted exemption in 1949, and another at Sterling was likewise declared tax exempt, date not given; that homes for the aged sponsored by numerous other church denominations, fraternal organizations, as well as hospitals operating in Kansas, have been granted tax exempt status as either religious, charitable or benevolent, or a combination thereof, by the highest taxing authorities of the State of Kansas, and none operated as Manor has been operated has been denied exemption until Manor was so denied by the State Board of Tax Appeals on December 18, 1963; that Manor paid the first half of its 1963 property tax under protest.

The trial court made findings of fact in accordance with the fore-

going and further found that Manor's property after August 1, 1963, was "exclusively used as a religious, charitable and benevolent home for the aged" and, therefore, was exempt from taxation. From this, and the order overruling motion for new trial, the defendants, hereinafter referred to as appellants, have appealed.

As the matter is now presented to us there is no effort to sustain the ruling made upon the basis that the property is used for religious purposes, and hence the sole question involved in the appeal is whether Manor's property is exempt from taxation by reason of being used for charitable and benevolent purposes.

Article 11, Section 1, of the Constitution of Kansas provides in part: ". . . All property used exclusively for . . . benevolent and charitable purposes . . . shall be exempted from taxation."

The pertinent part of K. S. A. 79-201 is as follows:

"That the property described in this section, to the extent herein limited, shall be exempt from taxation:

. . . . . . . . . . . .

"*Third.* All real property, and all tangible personal property, actually and regularly used exclusively for . . . benevolent or charitable purposes: *Provided,* That this exemption shall not apply to such property, not actually used or occupied for the purposes set forth herein, nor to such property held or used as an investment even though the income or rentals received therefrom is used wholly for such . . . benevolent or charitable purposes."

Appellants urge that the constitutional and statutory provisions for exemption must be strictly construed, that the burden is upon those claiming exemption from taxation to show that the use of the property in question comes fully within the terms of the exemption, and that the proper test for exemption from ad valorem taxation for benevolent or charitable purposes is that the property be used exclusively for those purposes. There can be no contention with respect to any of these as general propositions. For the first, see *Manhattan Masonic Temple Ass'n v. Rhodes,* 132 Kan. 646, 296 Pac. 734, wherein it was stated:

". . . Kansas is properly classified with the jurisdictions which adhere to the rule that constitutional and statutory provisions exempting property from taxation are strictly construed and all doubts resolved against the exemption. The rule of strict construction of statutes making exemptions from the burden of taxation which rests on the generality of persons and property has always prevailed in this state." (p. 649.)

And in *Federal Land Bank v. Board of County Commissioners,* 187 Kan. 148, 354 P. 2d 679, it was held that the burden of estab-

lishing exemption from taxation is on the one claiming it. And see *Masonic Home v. Sedgwick County*, 81 Kan. 859, 106 Pac. 1082, wherein it was in substance stated that the constitutional exemption from taxation depends solely upon the exclusive use made of the property and not upon the ownership or the character, charitable or otherwise, of the owner.

First of all let us look at what is meant by the terms *charitable* and *benevolent*. It has been said the word "charity," like many others, has both a lay and a legal meaning, and that in legal parlance the term has a much more extended significance than in common speech. (See 15 Am. Jur., 2d, Charities, §§ 2 & 3, pp. 7-8.)

In Black's Law Dictionary, 4th ed., we find this discussion of charity:

"It may mean or apply to:

"Accomplishment of some social interest, In re Tollinger's Estate, 349 Pa. 393, 37 A. 2d 500, 501, 502 . . . Amelioration of persons in unfortunate circumstances, Second Nat. Bank v. Second Nat. Bank, 171 Md. 547, 190 A. 215, 111 A. L. R. 711 . . . Any purpose in which the public has an interest, Collins v. Yyon, Inc., 181 Va. 230, 24 S. E. 2d 572, 580 . . . assistance to the needy . . . Improvement of spiritual, mental, social and physical conditions. Andrews v. Young Men's Christian Ass'n of Des Moines, 226 Iowa 374, 284 N. W. 186, 192 . . . Whatever proceeds from sense of moral duty or feeling of kindness and humanity for relief or comfort of another. Doyle v. Railroad Co., 118 Mass. 195, 198, 19 Am. Rep. 431." (pp. 296, 297.)

The same work defines *benevolent* as follows:

"Philanthropic; humane; having a desire or purpose to do good to men; intended for the conferring of benefits, rather than for gain or profit; loving others and actively desirous of their well being." (p. 201.)

In *Mason v. Zimmerman*, 81 Kan. 799, 106 Pac. 1005, it was stated:

" 'Charity' is a gift to promote the welfare of others in need, and 'charitable,' as used in such constitutional and statutory provisions, means intended for charity, and 'benevolent' is, as used therein, entirely synonymous with 'charitable.' " (Syl. ¶ 2.)

In *In re Estate of Carlson*, 187 Kan. 543, 358 P. 2d 669, we find this:

"A charity is broadly defined as a gift for general public use . . . Gifts for the purpose of establishing or maintaining hospitals, or like institutions for the benefit of the sick, injured, aged, infirm, or other persons in unfortunate circumstances are for a purpose recognized by the courts as charitable." (p. 546.)

Thus it may be seen that the term "charity" in a legal sense is rather a matter of description than of precise definition, and there-

fore each case involving a determination of that which is charitable must be decided upon its own particular facts or circumstances.

The gist of appellants' three contentions mentioned heretofore may be succinctly stated: That the evidence before the trial court did not warrant its finding that Manor's property was used exclusively for charitable and benevolent purposes, stressing that the facts as established do not meet the required test of exclusive use. In support of this argument appellants take one by one certain factors shown by the evidence and urge that these, taken either individually or collectively, do not establish that Manor's property was used exclusively for benevolent and charitable purposes.

Appellants properly stress the expression "used exclusively" in both the constitutional and statutory provisions. This expression simply has reference to the primary and inherent use of property as against a mere secondary or incidental use. That is the clear import of this court's definition of the term "exclusively" as set forth in *Sunday School Board of the Southern Baptist Convention v. McCue,* 179 Kan. 1, 5-6, 293 P. 2d 234.

Appellants first argue that the fact an entrance fee of $2,000.00 and the sum of $200.00 per month is sought, and received in about eighty-five percent of the cases, takes it out of the domain of charity. In the case of *Nuns of St. Dominic v. Younkin,* 118 Kan. 554, 235 Pac. 869, this court considered a similar contention and stated:

"The fact that it charges and receives pay for patients able to pay, does not detract from the charitable nature of the service rendered. In *Hospital Association v. Baker,* [40 S. D. 226] . . . 95 percent of the patients were pay patients. In City of *San Antonio v. Santa Rosa Infirmary,* [sic] [259 S. W. 926] . . . 87½ percent were pay patients. In *St. Elizabeth Hospital v. Lancaster County,* [109 Neb. 104] . . . only a small percent did not pay.
. . . . . . . . . . . .
"If these incomes from pay patients and donations are used for the purpose of caring for or relieving the sick or disabled and increasing the facility of the institution for that purpose, and are not used for the purpose of declaring dividends or the financial profit (other than the paying of necessary operating expenses) of those connected with or having charge of the institution, such use is simply an extended use for charitable purposes." (pp. 559, 560.)

Appellants say the *Nuns* case is to be distinguished on the basis that it is a hospital case, and not a rest home case, but they do not further point out the distinction. Be that as it may, absent specific constitutional or statutory authority for exemption of hospitals,

they must qualify for such exemption if at all on the basis of charitable institutions, the same as homes for the aged.

In 51 Am. Jur., Taxation, § 602, we find this:

"It is a well-established principle of law that a charitable institution does not lose its charitable character and its consequent exemption from taxation merely because recipients of its benefits who are able to pay are required to do so, where funds derived in this manner are devoted to the charitable purposes of the institution." (p. 585.)

Appellants next urge the fact that Manor's articles of incorporation and bylaws provide that it shall operate on a nonprofit basis does not necessarily make its property tax exempt, and with this proposition we cannot quarrel. While it could be pertinent to inquire into its corporate powers as to the expectation or possibility of profit, we believe the manner in which it is actually being operated is of more significance. We are here concerned with present and not future operations. In this connection appellants also argue that the deficit during the period of actual operations does not necessarily control the tax exempt status. As heretofore stated, appellants attempt to distinguish the *Nuns* case, supra, and thereby avoid its holding which was as follows: "The test which determines whether a hospital is charitable is whether it is maintained for gain or profit." (Syl. ¶ 1.)

Without detracting from what was said in the *Nuns* case, we recognize that the failure to make a profit does not convert a business into a charitable institution. It would probably be more accurate to say that an institution, in order to be exempt as charitable, must not be operated for private profit or gain, and no profit can be distributed to any members, stockholders or officers and they may not have any pecuniary interest in the property. (See 84 C. J. S., Taxation, § 282b. [4] [b].)

To pinpoint the matter further, and again without any effort to equate hospitals and homes for the aged, the test of whether an enterprise is charitable for ad valorem tax exemption purposes is whether its property is used to carry out a purpose recognized in law as charitable. The other side of the coin, of course, would be use for a purpose not so recognized including use for profit, gain or private advantage. (See 14 C. J. S., Charities, § 2, p. 416.)

Manor's operating statement indicated a deficit of approximately $50,000.00 would have occurred during the first seven months of operation but for the fact approximately $59,000.00 was received in gifts. Here again we cannot know what the future may hold

but it was stipulated in the agreed statement of facts that Manor will have to continue to receive gifts in order to operate.

Appellants likewise urge that the method of financing construction of the facilities does not establish any particular usage, charitable or otherwise. Conceding and without laboring the point, we can see that voluntary contributions made from charitable motives probably made the construction of the facilities possible. It does not appear to be of too great significance whether in a given period of time such contributions go to the capital costs or to the operating expenses of the institution.

Appellants conceded that the fact that the residents could be limited to Presbyterians (which the record reveals is not the case) does not necessarily deprive it of tax exempt status, and this is in line with the holding of *Masonic Home v. Sedgwick County,* supra, where this court clearly adopted the rule that the fact that the facilities of a home for the aged were available only to members of a particular group or class did not require a holding the property was not being used exclusively for charitable and benevolent purposes. The same rule was restated and readopted in *A. T. & S. F. Hospital Ass'n v. State Commission of Revenue & Taxation,* 173 Kan. 312, 246 P. 2d 299.

Traditionally special concern has been shown for the aged. Their peculiar needs arising out of the infirmities of body, mind and spirit that come with advanced age have received the attention of government at all levels and of citizens generally. In 1910 in *Ingleside v. Nation,* 83 Kan. 172, 109 Pac. 984, this court considered the constitutionality of an appropriation to a private organization whose purpose was to furnish a permanent Christian home at Topeka for homeless and aged women, and a temporary home for women seeking employment. To enter the home as a permanent resident the woman had to be not less than sixty-five years of age, and pay an admission fee of $300.00. The admission fee was not always required. Shawnee County paid a small monthly amount and the association depended to some extent upon contributions from persons who were charitably inclined. The court, in recognizing the association as a charitable institution, stated:

"It seems to us that the protection and comfort of aged women who are homeless and without means or near relatives able to provide them with subsistence is a matter of general public concern—a charity which will be regarded with universal favor." (p. 174.)

Financial standing is not necessarily a criterion. Long ago this court in *Troutman v. DeBoissiere*, 66 Kan. 1, 71 Pac. 286, quoted with approval the classic definition of Lord Camden, Eighteenth Century Chancellor of England, that charity is "A gift to a general public use, which extends to the poor as well as the rich," (p. 6) and in the same case, the court further stated: "Charity is not exclusive, and draws no distinction of class or caste." (p. 19.)

Many of the people who have been or will be received in Manor, where the average age is said to be eighty-two, will in the main be self-supporting persons who would not be willing to be classified as recipients of charity in the ordinary meaning of that term, yet the state does have a distinct interest in the well-being of this class of citizens by reason of their advanced age. In any event, insofar as Manor is concerned, it appears that its services are available to people of limited means and no more than a reasonable standard of care is provided.

Historically, courts and taxing authorities alike, including our own highest taxing authorities, have generally treated homes for the aged as charitable organizations.

In *Estate of Henderson*, 17 Cal. (2d) 853, 112 P. 2d 605, the court said: "Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable . . .," and again,

"Relief of poverty is not a condition of charitable assistance. If the benefit conferred has a sufficiently widespread social value, a charitable purpose exists . . . aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants." (p. 857.)

The same court said later in *Fredericka Home v. County of San Diego*, 35 Cal. (2d) 789, 221 P. 2d 68:

"The concept of charity is not confined to the relief of the needy and destitute. Apart from financial assistance, it comprehends the supply of care and attention to aged people." (Syl. ¶ 2.)

The manner of operation of the Fredericka home was substantially similar to the operation of Manor except Fredericka used a "life care contract" basis for admission, with a more substantial entrance fee. The fees were inadequate to mantain operation of the home without gifts or donations. The court held that in spite of the substantial entrance fee, where the payments were within reach of persons of limited means and were not commensurate with the costs

of the benefits they received, and there was no element of private gain with all of the organization's income devoted exclusively to affording a reasonable standard of care to such persons, the home's property was used exclusively for charitable purposes.

We have noted other matters mentioned by appellants but from all the precedents and an examinaton of the general overall nature of Manor's operation, we are constrained to hold that the facts in the record indicate its property is used to carry out a purpose recognized in law as charitable. It therefore, follows that the trial court's order was correct and it is affirmed.

APPROVED BY THE COURT.

PRICE, J., dissenting: I think that a very bad and unwise far-reaching precedent is being set in this case, and therefore am unable to agree to the disposition being made of it. In my opinion it may not be said that the property in question is used exclusively for benevolent and/or charitable purposes within the legal meaning of those words as used in the constitutional and statutory provisions under consideration. I therefore respectfully dissent.