No. 46,108

THE EVANGELICAL VILLAGE AND BIBLE CONFERENCE, INC., A Corporation, *Appellant*, v. THE BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, ROBERT R. DAVIS, REX F. PRICE, and VICTOR W. KEARNS, JR., as Commissioners thereof, DONALD J. CURRY, as County Clerk of Johnson County, Kansas, WILLIAM A. BAKER, as County Assessor of Johnson County, Kansas, and EDNA C. CRAIG, as County Treasurer of Johnson, Kansas, *Appellees*.

(485 P. 2d 843)

Opinion filed May 15, 1971.

*Eugene T. Hackler*, of Hackler, Anderson, Londerholm, Speer and Vader, of Olathe, argued the cause, and *Eugene F. Gastl*, of Shawnee, and *Arthur L. Claussen*, of Crane, Martin, Claussen and Ashworth, of Topeka, were with him on the brief for the appellant.

*Bernis G. Terry*, of Olathe, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

HATCHER, C.: This is an appeal from a judgment of the district court denying exempt status in an action to enjoin the levy and collection of taxes upon certain real property of the appellant, The Evangelical Village and Bible Conference, Inc., and to have the property declared exempt from taxation by virtue of constitutional and statutory provisions exempting from taxation property used exclusively for benevolent and charitable purposes.

The Evangelical Village and Bible Conference, Inc., is a Kansas corporation organized not for profit and without authority to issue

capital stock. It was formed in 1962, as a result of efforts by a group of area ministers for the purpose of building a home for elderly persons in Johnson County. The incorporators, who also served as the first board of directors, were drawn from this group. Of the five ministers who served as incorporators, three were from the Shawnee Mission area of Johnson County, one was from Kansas City, Kansas and one from Kansas City, Missouri. The overall group was known as the Evangelical Ministers Fellowship.

The principal purpose for which the corporation was formed, as expressed in its Articles of Incorporation, reads:

"To provide elderly persons on a nonprofit basis with housing facilities and services, specially designed to meet the physical, social and psychological needs of the aged, and contribute to their health, security, happiness and usefulness in longer living."

Upon dissolution of the corporation, none of the net assets was to go to any director, officer or other persons connected with the corporation. The assets were to be devoted exclusively for the benefit of religious, charitable, philanthropic, welfare, relief, educational, scientific and similar activities. Persons connected with the corporation and private individuals were prohibited from receiving any earnings or profit from its operations.

Under the articles of incorporation the board of directors elects the members of the corporation and these members are required, in turn, to be members of an evangelical church and to subscribe to a basic statement of religious faith. No more than two members may be from one church denomination. Upon election these members become members of the board of directors. In 1968, seven of the nine board members were area ministers. A twenty-one member advisory council, appointed to advise on religious and welfare matters affecting residents, has a membership drawn from nineteen area churches representing six different religious denominations. The by-laws of the corporation provide for a letter of intent whereby area church congregations may adopt the home as a project. Some nineteen area congregations had adopted the home as a project by 1968. These churches agree that it will be their "moral responsibility . . . to ensure that the Home is maintained and fulfills the purpose for which it is being established." They also agree to take at least one special offering per year for the home in the event of need.

In December, 1964, the corporation completed the construction

of a three wing, five story home on a tract of land located at 9100 Park in Lenexa.

Construction financing was furnished by an FHA insured loan of $2,631,979.21 from the Morgan Guaranty Trust Company of New York and an additional $212,962.88 borrowed from local banks on the strength of guarantees by eight local individuals interested in the building of the home.

Approximately 80% of the accommodations at the home are single room apartments with a bath and, in some instances, a kitchen. For these rooms Lakeview Village collects an entrance fee (called a founder's fee) of $6,900.00 to $10,200.00 and a monthly subsistence charge of $155.00 to $175.00, depending on the size of the accommodations and whether cooking facilities are available. The monthly subsistence charge includes room and board, laundry and ordinary care with fourteen days infirmary care per year. The remaining accommodations are two room apartments with bath and kitchen. The founder's fee for these is $11,500.00 to $13,200.00 and the monthly subsistence charge is $215.00 to $225.00 for one person.

Of the one hundred ninety-nine persons in residence at Lakeview Village in May, 1968, thirty-seven were paying less than the requested monthly charges; five residents had paid no entrance fee; four residents had paid less than the requested entrance fee, and three persons had paid less than the requested entrance fee and also were paying less than the requested monthly charge.

The monthly subsistence rate paid by the Johnson County Welfare Department for clients in the Johnson County Home for the Aged is $240.00. The rate in the remaining homes in the county is $230.00. The Welfare Department also pays to each person an additional sum of $17.00 per month for incidental expenses. Lakeview Village has made offers to the Johnson County Welfare Department to take welfare patients and in 1968 had one welfare client in residence.

Residents of Lakeview Village have an occupancy agreement which provides in essence that they shall have the privilege of occupying their quarters throughout their lifetime. This is subject only to certain special conditions such as contagious disease, permanent disability or mental condition detrimental to the other residences, in which case transfer to an appropriate facility is made with Lakeview Village sharing the cost of outside care at a rate of 50% of the usual monthly charge and, if the transfer becomes per-

manent, the entrance fee is also applied for use until exhausted. No resident has ever been removed from the home for non-payment of charges and where persons have been unable to pay, the charges either have been reduced to what the person can pay or else entirely waived.

The minimum age for entrance to the home is 62 years and the maximum age is 78 years. In 1968, the average age of the residents was approximately 78. Over one-half of the residents were between 75 and 84 years of age. At the time of entrance, residents must be ambulatory and able to dress and feed themselves.

The board of directors of the corporation receives no salary for its services. One of the original directors was paid a commission for securing residents for the home during its initial stages.

On May, 1968, Lakeview Village had received $5,212.00 in cash donations for the home. Over three thousand hours had been donated by religious workers, nurses and teachers and other items such as an organ and piano for the chapel area had been given to the home.

After hearing the evidence, the trial court made extended findings of fact and concluded:

"And now on this 7th day of July, 1969, the court, having considered the evidence, the suggested findings of fact and conclusions of law and the various briefs submitted by the parties hereto and the briefs submitted by the amicus curiae and being otherwise well and duly advised in the premises, announces and files its memorandum decision with the clerk of this court setting forth its findings of fact, conclusions of law, rationale and decision and order for judgment, which memorandum decision, less formal parts, is hereby incorporated herein by reference as though the same were set out herein in full, the court finding and concluding that plaintiff's real property is not being used exclusively for religious, benevolent or charitable purposes as provided in Article 11, Section 1, of the Kansas Constitution and K. S. A. 79-201 and that plaintiff is not exempt from Kansas real property taxation for the years 1965, 1966 and subsequent years. The court further finds that the costs hereof should be taxed against the plaintiff."

On appeal to this court, appellant listed its main statement of points relied upon as—

"The evidence does not support, but contradicts the Court's finding and conclusion that plaintiff's real property is not being used exclusively for religious, benevolent or charitable purposes, as provided in Article 11, Section 1, of the Kansas Constitution and K. S. A. 79-201."

It then detailed seven secondary points challenging the court's findings and conclusions on the evidence submitted.

In its brief before this court, appellant argues two points—(1) "On the facts, this case is essentially identical with Topeka Presbyterian Manor v. Board of County Commissioners; that decision granting tax exemption should control here" and (2) "the trial court erroneously distinguished this case from prior Kansas decisions for reasons which are either insubstantial or immaterial."

The appellees now contend that the "Appellant has no right to be heard on this appeal for the reason that it has abandoned its statement of points."

Our attention is called to Rule No. 6 (*d*) of this court which provides:

"Each appellant shall serve and file with his designation of the record a concise statement of the points on which he intends to rely and which will be briefed in the appeal. The points shall be without duplication, and each point shall state a particular and ultimate issue with reference to which reversible error is claimed to have been committed, but only such detail is required as will (1) enable opposing parties to judge the sufficiency of the designated record on appeal, and (2) inform the supreme court of the specific issues to be considered."

The rule further provides that no issue other than an issue going to the jurisdiction of the court over the subject matter may be considered unless it is included in the statement of points. In *Schreppel v. Campbell Sixty-six Express, Inc.*, 201 Kan. 448, 441 P. 2d 881, we stated at page 454:

"The reasons for this rule are two-fold: first, it enables the opposing party to judge the sufficiency of the record which has been designated on appeal and second, it informs the members of this court of the specific issues to be considered on appeal. The rule thus serves a legitimate and important purpose. . . ." (See, also, *Board of County Commissioners v. Brookover*, 198 Kan. 70, 74, 422 P. 2d 906.)

The rule serves an important and valid purpose and we do not care to relax in its application. However, it appears to us in the present case that none of the points have been abandoned or new ones added. The appellant has simply rearranged his classification of points to avoid repetition and simplify the presentation of the issues. No new issues are raised which would in anyway require additions to or subtractions from the record. We find no objection to the simplified classification of the points.

The chief issue for our determination is, did the evidence presented bring the appellant within the provisions of Article 11, Section 1, of the Kansas Constitution which provides in part:

". . . All property used exclusively for . . . religious, benevolent and charitable purposes, . . . shall be exempt from taxation."

and K. S. A. 79-201 which contains a similar provision?

The facts are not in serious dispute. Neither are the trial court's findings. The basic dispute is over the legal conclusions which the trial court drew from the findings made.

The appellant contends that the facts in this case are essentially identical with *Topeka Presbyterian Manor v. Board of County Commissioners,* 195 Kan. 90, 402 P. 2d 802, and that decision granting tax exemption should control the decision in the case now before us.

We are forced to agree. In *Topeka Presbyterian Manor* we considered at length the meaning of the terms charitable and benevolent and stated:

"First of all let us look at what is meant by the terms *charitable* and *benevolent.* It has been said the word 'charity,' like many others, has both a lay and a legal meaning, and that in legal parlance the term has a much more extended significance than in common speech. (See 15 Am. Jur., 2d Charities, §§ 2 & 3, pp. 7-8.)

"In Black's Law Dictionary, 4th ed., we find this discussion of charity:

" 'It may mean or apply to:

" 'Accomplishment of some social interest, In re Tollinger's Estate, 349 Pa. 393, 37 A. 2d 500, 501, 502 . . . Amelioration of persons in unfortunate circumstances, Second Nat. Bank v. Second Nat. Bank, 171 Md. 547, 190 A. 215, 111 A. L. R. 711 . . . Any purpose in which the public has an interest, Collins v. Yyon, Inc., 181 Va. 230, 24 S. E. 2d 572, 580 . . . Assistance to the needy . . . Improvement of spiritual, mental, social and physical conditions. Andrews v. Young Men's Christian Ass'n of Des Moines, 226 Iowa 374, 284 N. W. 186, 192 . . . Whatever proceeds from sense of moral duty or feeling of kindness and humanity for relief or comfort of another. Doyle v. Railroad Co., 118 Mass. 195, 198, 19 Am. Rep. 431.' (pp. 296, 297.)

"The same work defines *benevolent* as follows:

" 'Philanthropic; humane; having a desire or purpose to do good to men; intended for the conferring of benefits, rather than for gain or profit; loving others and actively desirous of their well being.' (p. 201.)

"In *Mason v. Zimmerman,* 81 Kan. 799, 106 Pac. 1005, it was stated:

" ' ' "Charity" is a gift to promote the welfare of others in need, and "charitable," as used in such constitutional and statutory provisions, means intended for charity, and "benevolent" is, as used therein, entirely synonymous with "charitable." ' " (Syl. ¶ 2.)

"In *In re Estate of Carlson,* 187 Kan. 543, 358 P. 2d 669, we find this:

" 'A charity is broadly defined as a gift for general public use . . . Gifts for the purpose of establishing or maintaining hospitals, or like institutions for the benefit of the sick, injured, aged, infirm, or other persons in

unfortunate circumstances are for a purpose recognized by the courts as charitable.' (p. 546.)

"Thus it may be seen that the term 'charity' in a legal sense is rather a matter of description than of precise definition, and therefore each case involving a determination of that which is charitable must be decided upon its own particular facts or circumstances." (p. 94.)

We also stated at page 95 of the opinion the effect of an entrance fee on tax exempt status of a claimed charitable institution—

"Appellants first argue that the fact an entrance fee of $2,000.00 and the sum of $200.00 per month is sought, and received in about eighty-five percent of the cases, takes it out of the domain of charity. In the case of *Nuns of St. Dominic v. Younkin*, 118 Kan. 554, 235 Pac. 869, this court considered a similar contention and stated:

" 'The fact that it charges and receives pay for patients able to pay, does not detract from the charitable nature of the service rendered. In *Hospital Association v. Baker*, [40 S. D. 226] . . . 95 percent of the patients were pay patients. In *City of San Antonio v. Santa Rosa Infirmary*, [sic] [259 S. W. 926] . . . 87½ percent were pay patients. In *St. Elizabeth Hospital v. Lancaster County*, [109 Neb. 104] . . . only a small percent did not pay.

.    .    .    .    .    .    .    .    .    .    .    .

" 'If these incomes from pay patients and donations are used for the purpose of caring for or relieving the sick or disabled and increasing the facility of the institution for that purpose, and are not used for the purpose of declaring dividends or the financial profit (other than the paying of necessary operating expenses) of those connected with or having charge of the institution, such use is simply an extended use for charitable purposes.' (pp. 559, 560.)"

The definitions appear to cover the field. It would serve no useful purpose to attempt to extend them with quotations from other authorities. We held that the Topeka Presbyterian Manor was exempt from taxation under the definitions given the terms charitable and benevolent. It remains to be determined whether or not the operations of the Evangelical Village and Bible Conference, Inc., are essentially identical with the operations of the Topeka Presbyterian Manor.

Each of the institutions was a home for the elderly; each was a nonprofit Kansas corporation with no capital stock; in each, upon dissolution, the assets would be used for tax exempt purposes and not for the benefit of any private individual; in each the purpose was to provide elderly persons with homes on a nonprofit basis; each requested residents to pay a resident fee and monthly charge differing only in amount; in each the admissions were not restricted to a single religious denomination; each had regular weekly religious

services and infirmary care with registered nurses and nursing facilities; each made services available to persons of limited means; in the operation of each no profit inures to anyone and only reasonable compensation is paid employees.

The average age of residents in the Topeka Presbyterian Manor is 82 while that of the appellant is 78. As in most other instances the difference is only in degree.

The trial court listed five propositions which it considered the rationale of its decision. These we shall discuss.

The trial court states that, "the different amounts and nature of the founder fees and monthly subsistence payments negate a charitable or benevolent purpose."

Here again we have only a matter of degree. The difference in the fees is not based so much on service as the accommodations furnished. The different amounts are based on the size of the accommodations, the number of rooms and the presence of kitchen facilities.

The trial court concluded:

". . . Plaintiff relies on *Manor*, supra, as the basis of its alleged exemption. The Court feels the facts in this case clearly are distinguishable. In *Manor* the home was directly connected with a church or particular theology, whereas here the home has no specific non-profit organization backing it; . . ."

The facts here show that a number of area church denominations are supporting Lakeview Village and, upon dissolution, its assets, if any, would go for charitable or other tax exempt purposes.

The trial court emphasized the fact that—

"In *Manor* almost one-third of the construction cost of $400,000.00 was donated and the Manor had to have gifts to operate, the evidence being that in the first seven months it received $59,000.00. Here the entire cost of construction was financed. The only cash contribution being the sum of $5,212.00. . . ."

It might be suggested that an additional $212,962.88 was borrowed from local banks on the signatures of eight local individuals interested in the building of the home. Also, over three thousand hours had been donated by religious workers, nurses and teachers and various items such as an organ and piano for the chapel area had been given to the home.

The trial court states that—

"Plaintiff here operates a retirement home and not a home for the aged. . . ."

It is our understanding that people are retired because of age. Also, we are of the opinion that people averaging 78 years of age must be classified as elderly.

The trial court found that the occupancy agreement negates a charitable and benevolent purpose. The occupancy agreement for appellant provides for certain special conditions under which occupancy may be terminated, including permanent physical or mental disability. Lakeview Village is not a nursing home. It has made provision for cases where residents come under permanent disability and need care beyond that which can be provided within the home. The occupancy agreement provides for an adjustment in such cases. This provision is consistent with care and concern for residents and bespeaks an interest in providing them with proper care as required by circumstances.

Appellees make the contention:

"In addition to the issues in this case which were common to those in the *Manor* case and those additional issues heretofore mentioned, there exists in this case certain factors which draw into serious question the credibility, or at least the capability, of appellant to be entrusted with a tax exemption:"

The appellees are referring to the payments made to Dr. Berg. On this issue the trial court found:

"Dr. Berg acted as a promoter and was instrumental in getting the corporation started. He used the title of coordinator and performed services as locating the site for the proposed home, arranging for the necessary financing, securing the services of an architect and contractor, making arrangements for an FHA loan and conducting a campaign to publicize the location and purpose of the home and to secure residents to move into same when completed. He further set up an Iowa corporation of his own, Christian Services, Inc., in connection with the program of locating prospective occupants and was working with other groups at the same time."

We are not placing our approval on the payments made to Dr. Berg. We can only state that the record is lacking sufficient evidence of the value of his services to permit a specific finding that he was overpaid.

We are unable to find any logical basis for making a distinction between the Topeka Presbyterian Manor and the appellant in this case for tax exemption purposes.

There is another issue which should perhaps receive attention. At the close of the appellant's argument, counsel left with this court charts showing certain figures and their application. There was also left with this court certain pamphlets consisting of adver-

tising used by appellant. Appellees have filed written objections to the use of such material by this court.

It is made to appear that the figures in the plats are in dispute. The plats and pamphlets were not a matter of record and were not before the trial court, hence they will therefore not be considered by this court.

The judgment is reversed with instructions to the trial court to declare the appellant's real property pertaining to the home for the retired exempt from taxes for the years 1965, 1966, and subsequent years.

APPROVED BY THE COURT.

PRICE, C. J., dissents.

FONTRON, J., dissenting: Although I joined the opinion in *Topeka Presbyterian Manor v. Board of County Commissioners*, 195 Kan. 90, 402 P. 2d 802, I felt at the time we had proceeded in the direction of charitable exemptions about as far as we could rationally go. That feeling persists today. Hence, I do not favor extending the boundaries of that case.

In my judgment there are sufficient differences in the case before us now to distinguish it from *Presbyterian Manor*. Several distinctions are mentioned in the court's opinion although most of them, it must be conceded, are differences in degree rather than in kind.

In addition, the record reflects a suggestion of commercialism which was absent in the *Manor* case. There is also a vague hint of possible dispossession in certain letters addressed to residents whose financial resources were rapidly being depleted. Finally, the plaintiff has not been approved for nor has it been granted tax exemption status within the purview of U. S. C. Title 26, § 501 (c) or Title 26, § 170 (a).

Perhaps no one of the matters noted above would, standing alone, be of sufficient significance to warrant withholding tax exempt status under Kansas law. Taken together, however, they are sufficient in total, as I view them, to justify the trial court in its conclusion. I would affirm the judgment.

O'CONNOR, J., joins in the foregoing dissent.